# United States Court of Appeals
## For the First Circuit

No. 03-1518

JOSE TEODORO NAVARRO-CHALAN,

Petitioner,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez, and Howard,
Circuit Judges.

John P. Bueker, with whom Ropes & Gray LLP and Bradford E. Steiner were on brief, for petitioner.

Alison Marie Igoe, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, and Michael P. Lindemann, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

February 25, 2004

**LYNCH**, **Circuit Judge**.  Jose Teodoro Navarro-Chalan, a native and citizen of Peru, was arrested by INS agents on February 20, 1996 for having overstayed his permission to be in this country.  He was ordered deported in August 1998, and the BIA affirmed that order in March 2003.  Navarro has never argued that he should be allowed to stay in the United States because he is legally here; he argues only that the INS arrest and later proceedings were so flawed as to entitle him to the relief of cancellation of deportation.  On his petition for review, we uphold the order of deportation.

**I.**

The following facts appear from the decision of the Immigration Judge or from the record and are supported by substantial evidence.  In February 1996, based on information from the United States Customs Service and from INS Special Agent Jarvis, the INS determined that a man named Jose Teodoro Navarro-Chalan had entered the United States in New Orleans on August 2, 1990 and was presently working in Boston for Dobbs, a catering company at Logan Airport, in violation of immigration laws.  Although it is not clear from the record how this information was obtained, Navarro admitted entering the United States as a crewman, and INS regulations require that crewmen register with the INS in order to receive landing privileges, which allow them to stay in the United States for up 29 days while their ship remains at port.

-2-

8 C.F.R. § 252.1(c)-(d). Presumably, the INS had some record of Navarro's admission as a crewman and suspected from the length of his stay and his current job that he had overstayed his landing privileges.

The INS issued a warrant for Navarro's arrest. The INS arranged for Dobbs to instruct five of its employees to go to the international terminal at Logan Airport, where the INS had an upstairs facility, on February 20, 1996. Navarro testified that he could have chosen not to go, but only at the risk of losing his job.

At around 10:20 a.m., the employees arrived at the terminal and were met by six government agents, including three armed police officers. Several employees were questioned and, after they produced identification, were allowed to step away from the group. When Navarro was asked for his name and nationality, he produced a driver's license and stated that he was from Peru. At 10:30 a.m., an INS agent filled out a Form I-213 (Record of Deportable Alien) indicating that Navarro was a Peruvian citizen who had entered this country as a crewman on August 2, 1990 and had been authorized to stay for no longer than thirty days. About 15 minutes later, Navarro was served with the previously prepared arrest warrant. He was simultaneously served with Form I-286 (Notification to Alien of Conditions of Release or Detention), which informed him in English and Spanish that he was being

released on his own recognizance, that he had the right to legal representation, that free representation was available, and that a hearing would be held before an immigration judge. Navarro signed the form, acknowledging its receipt.

Navarro testified that he was then taken upstairs to an interrogation room at around 11:00 a.m., where he answered several agents' questions about when and how he had entered the country. He testified that one agent told him that he would be deported from the United States that very day. At some point before Navarro was released, he was served with a copy of an Order to Show Cause, which notified him in Spanish and English that any statements he made to an INS officer could be used against him and which reiterated that Navarro had the right to representation, that free representation was available, and that he would have a hearing before an immigration judge. Although Navarro later testified that he was never informed of his rights orally, the order indicates that it was read orally in Spanish to Navarro. Physical force was not used at any time, nor was Navarro deprived of the use of the bathroom.

## II.

On July 2, 1997, Navarro had a hearing before an IJ. He testified, invoking his Fifth Amendment privilege several times. He also sought to suppress, on both constitutional and non-constitutional grounds, all evidence arising from his February 20,

-4-

1996 statements to the INS agents, including Form I-213. The IJ held an evidentiary hearing on the issue of suppression, in which Navarro again testified. After the hearing, the IJ made a specific finding that Navarro's statements to the INS agents were voluntary, noting, inter alia, that "[r]espondent presented no evidence that he was threatened or coerced to answer the questions by the agent." The IJ also rejected Navarro's Fourth Amendment argument on the ground that the exclusionary rule does not apply to civil deportation hearings, at least absent extraordinary circumstances not present here. The IJ did not address certain claims arising under INS regulations. The IJ found Navarro deportable and permitted voluntary departure. The BIA affirmed without opinion.

## III.

Petitioning for review from the deportation decision, Navarro argues that his statements on February 20, 1996 should have been suppressed as the fruit of an unlawful interrogation in violation of his Fourth and Fifth Amendment rights and that, without this information, there is insufficient evidence to deport him. He also says that the procedures used by the agents violated INS regulations 8 C.F.R. §§ 287.3 and 242.2(c) (1995).[1] We deal with each argument in turn.

---

[1] The 1995 version of the regulations applies because the alleged violations occurred on February 20, 1996.

As to Navarro's first argument, we note that the government need only establish the respondent's identity and alienage to meet its burden on deportation. INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984). The burden then shifts to the respondent to show the time, place, and manner of entry in order to defeat deportation. Id.; see 8 U.S.C. § 1361. The government has met its burden here based on Navarro's pre-arrest statements of his name and nationality, as recorded on Form I-213, which the IJ properly refused to suppress for the reasons described below.[2] Navarro, however, has made no effort to carry his burden other than moving to suppress.

Navarro's name is not information even subject to being suppressed. The identity of an alien, or even of a defendant, is "never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984).

The next issue is whether Navarro's pre-arrest statement of his alienage, and its recording in Form I-213, may be

---

[2] Navarro goes on to complain about statements made later that day, arguing that he was inadequately advised of his rights. We do not reach the question of the suppression of Navarro's later statements, since the government has already met its burden on deportation based on his pre-arrest statements. We do note, however, that the record flatly refutes Navarro's assertion to this court that he was never advised of his rights. Navarro was served with Form I-286, which informed him in Spanish of his right to a hearing and to representation, simultaneously with his arrest warrant. Navarro's counsel conceded to the IJ that Navarro can read Spanish.

suppressed. Navarro first argues that his statement of his alienage should be suppressed because the arrest was in violation of the Fourth Amendment. We reject this argument for two reasons. First, Navarro's statement of alienage was made before he was arrested. Navarro was not in custody until the warrant was served. The IJ had adequate support for his finding that, before that point, Navarro voluntarily chose to be there rather than to risk losing his job, and there was no evidence that Navarro asked to leave, was told that he could not leave, or was restrained from leaving until the warrant was served. Second, Navarro has not demonstrated that his arrest violated the Fourth Amendment. Once Navarro's identity was confirmed, he was lawfully arrested pursuant to the warrant. The arrest was the prelude to a civil immigration proceeding, and not to a criminal proceeding.

Navarro, attempting to bring himself within the glimmer of hope of suppression left open by Lopez-Mendoza, also argues that his statement of his alienage should be suppressed as involuntary. In Lopez-Mendoza, the Supreme Court concluded that the cost of the exclusionary rule generally outweighs its benefits in the context of civil deportation hearings. Id. at 1050-51. The Court thus held that the exclusionary rule generally should not apply in that context, but may have left the door open in cases of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the

probative value of the evidence obtained." Id. Navarro's list of complaints, however, does not rise to that level of egregiousness. The IJ found, with adequate support, that Navarro's statements were voluntary.

Navarro disagrees, insisting that his statement of his alienage must be found involuntary because of the site of the questioning and because he was not given a statement of rights before he revealed his nationality. We reject these arguments. As to the site of the questioning, nothing requires the INS to perform an immigration raid on the premises of an employer, particularly when the employer cooperates with the INS to make its suspect employees available at another location. Employers have good business reasons for such agreements, which avoid disruption of the workplace. As to the statement of rights, the failure to notify a respondent of his or her rights does not render an otherwise voluntary statement inadmissible in a deportation case. See Navia-Duran v. INS, 568 F.2d 803, 808 (1st Cir. 1977). Here, the IJ had adequate evidence to conclude that Navarro's decision to cooperate by giving his name and nationality was voluntary. Navarro saw others being asked to step back, away from the INS questioners, when they cooperated by presenting their identification.

We turn to Navarro's argument that the INS did not follow its own regulatory procedures. Again, the record flatly refutes

these claims. Regulation 287.3, by its own terms, applies only to warrantless arrests. 8 C.F.R. § 287.3; see Navia-Duran, 568 F.2d at 809. Navarro's arrest occurred pursuant to a warrant. Navarro argues, however, that in the 20 to 25 minutes after he got to the terminal but before the arrest warrant was served, he was being held without a warrant and was thus within the scope of § 287.3. We reject this argument. As we have said, Navarro was not in custody until the arrest warrant was served. And even if he was in custody during that 20 to 25 minute period, the fact that the officers took time to confirm his name and nationality before serving the warrant does not mean that he was somehow "arrested without a warrant." Finally, even if § 287.3 were applicable and were violated, INS regulations state that § 287.3 and the other regulations in its subpart "do not, are not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." 8 C.F.R. § 287.11 (1995) (current version at 8 C.F.R. § 287.12).[3]

---

[3] Navarro argues that § 287.11 does not bar him from "pursu[ing] remedies for regulatory violations where constitutional rights are at stake or where the violation affects the overall fairness of the proceeding." But even if this were so, he has not shown that those conditions are present here. As we have said, Navarro's statements were voluntary. Cf. Navia-Duran, 568 F.2d at 810 (reversing a deportation order when an INS officer never notified the respondent of her rights, thus violating 8 C.F.R. § 287.3, because this failure, combined with other facts, indicated that respondent's statements were coerced).

Regulation 242.2(c), which does apply to arrests by warrants, was satisfied when Navarro was given Form I-286 and the Order to Show Cause, both of which contained statements of his rights. Navarro argues that § 242.2(c) requires that the Order to Show Cause must be explained to the respondent contemporaneously with the service of the arrest warrant, and that, here, it was read to Navarro (in Spanish) five hours late. Regulation 242.2(c) states that "[w]hen a warrant of arrest is served under this part, the respondent shall have explained to him/her the contents of the order to show cause . . . ." The regulation does not specify how long an agent can wait after the service of the warrant before explaining the Order to Show Cause. But even if Navarro is correct that five hours is too long, he concedes that his statements could be suppressed only if he could show prejudice from the violation of the regulation. No such prejudice has been shown here. The statements upon which Navarro's deportation was based were made before the arrest warrant was served, so even if the Order to Show Cause had been read simultaneously with the service of the warrant, it would not have affected the evidence supporting Navarro's deportability.

In sum, the arguments presented in this petition for review are without merit.

**IV.**

We **affirm** the order of deportation, including the privilege of voluntary departure from this country.  So ordered.