In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-4195

KARAYANA HADAYAT,[Œ]

*Petitioner*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A76-773-848

ARGUED OCTOBER 27, 2005—DECIDED AUGUST 15, 2006

Before RIPPLE, KANNE, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. Karayana Hadayat, an Indonesian national, arrived in the United States in 1999 on a visitor visa. Soon thereafter, his brother, a U.S. citizen, filed a visa petition on Hadayat's behalf. Although the petition was approved, no visa was immediately available. Once his visitor visa expired, the only legal option available to

---

[Œ] The petitioner's name is identified in the administrative record as Karayana Hidayat. Since both his counsel and the government use the spelling Karayana Hadayat in this petition for review, we do so as well.

Hadayat was to return to Indonesia and await action on his brother's petition. Hadayat chose another path: he decided to stay in the United States unlawfully and wait until a permanent resident visa became available, hoping in the meantime not to attract the attention of immigration authorities. This waiting game came to an abrupt end in 2003 when Hadayat registered with the Department of Homeland Security (DHS) pursuant to the newly-promulgated National Security Entry-Exit Registration System (NSEERS) and was immediately placed into removal proceedings. Although he initially agreed to a voluntary departure order, just before his deadline to depart Hadayat filed a motion to reopen with the immigration judge (IJ), arguing that he was entitled to remain in the United States based on his now-approved petition. The IJ denied Hadayat's motion to reopen and the Board of Immigration Appeals (BIA) affirmed. Hadayat filed a motion for reconsideration with the BIA, which was also unsuccessful.

Hadayat now contends that the BIA erred in denying his motion for reconsideration. He also raises the new argument that he was unconstitutionally targeted for registration and removal based on his ethnicity and religion. Because we conclude that Hadayat's approved visa petition does not, as a matter of law, allow him to remain in the United States, and because we lack jurisdiction over Hadayat's challenge to the Attorney General's decision to commence proceedings against him, we affirm the BIA's decision.

**I**

Hadayat arrived in the United States on January 22, 1999. Hadayat's brother, Derry Bankston, filed an I-130 Petition for Alien Relative on Hadayat's behalf on June 23, 1999. On July 22, 1999, Hadayat's visitor visa expired. In late 2001, Bankston received notice from the then Immigra-

tion and Naturalization Service that Hadayat's petition had been approved. The notice stated, however, that Hadayat was "not eligible to file an adjustment of status application" (presumably because no visa was currently available).

In August 2002, the Department of Justice published the final rule enacting the NSEERS program, explaining that "[r]ecent terrorist incidents have underscored the need to broaden the special registration requirements for nonimmigrant aliens from certain designated countries . . . whose presence in the United States requires closer monitoring, to require that they provide specific information at regular intervals to ensure their compliance with the terms of their visas and admission, and to ensure that they depart the United States at the end of their authorized stay." Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584 (Aug. 12, 2002). A later notice specifically required nonimmigrant male nationals and citizens of Indonesia to register with the DHS by March 28, 2003, Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2363 (Jan. 16, 2003), a deadline that was later extended to April 25, 2003. Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 8046 (Feb. 19, 2003). Hadayat registered on April 22, 2003, and was issued a Notice to Appear (NTA) the same day, charging that he had overstayed his visitor visa.

On September 9, 2003, Hadayat appeared before an IJ. He admitted that he was out of status and asked for and received a voluntary departure order. This order required Hadayat to leave the United States by December 9, 2003. Shortly after the hearing, Bankston filed a lawsuit in federal court seeking to enjoin the DHS from removing his brother, contending that Hadayat was entitled to remain in the United States based on the approved visa petition and challenging the constitutionality of NSEERS. In late 2003, the district court dismissed the case, concluding that

Bankston lacked standing to bring these claims on behalf of his brother.

Four days before his required departure date, Hadayat filed a motion to reopen with the IJ, citing his approved visa petition and the pending federal lawsuit as grounds for a new hearing. He also filed a request for an extension of his voluntary departure date with the District Director of the Chicago office of the DHS. (The record does not reveal the District Director's response to this request.) December 9 came and went, and Hadayat did not leave the United States. Eventually, on February 20, 2004, the IJ denied Hadayat's motion to reopen, explaining that:

> 1. The respondent has not established prima facie eligibility for Adjustment of Status under section 245(i). The cut-off date for visa petitions filed by USC brothers is February 22, 1992. Since the petition filed by the respondent's brother was filed on January 3, 1999, he is at least seven [years] away from visa availability.

> 2. Under Matter of Shaar,[21 I&N Dec. 541 (BIA 1996),] when an alien requests and receives voluntary departure, he must depart within the allotted time, otherwise he is barred from Adjustment of Status. In this case, the respondent was given the appropriate warnings at his hearing on September 9, 2003 and yet has remained in the U.S. after voluntary departure expired.

Hadayat appealed. The BIA affirmed on the first ground only, explaining that "[t]he fact that he is a beneficiary of an approved visa petition, without evidence that he has a current priority date, is insufficient to support a motion to reopen." Hadayat did not file a petition for review from this order.

Instead, he filed a motion for reconsideration with the BIA, contending that our then-recent decision in *Subhan v. Ashcroft*, 383 F.3d 591 (7th Cir. 2004), dictated a result in his favor. The BIA disagreed, distinguishing *Subhan* as a

case concerning "the denial of a continuance motion where . . . the Immigration Judge failed to give a reasoned explanation of the denial." In Hadayat's case, the BIA explained, the IJ "gave a reasoned explanation why he denied the respondent's motion to reopen." The BIA also reiterated that Hadayat was ineligible to adjust his status because no visa was immediately available and added that his failure to comply with the voluntary departure order created a further bar. Hadayat petitioned for review of this order.

## II

We have jurisdiction over Hadayat's petition for review of the BIA's denial of his motion for reconsideration pursuant to 8 U.S.C. § 1252(b). We review the BIA's denial of a motion for reconsideration for an abuse of discretion. *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 724 (7th Cir. 2005).

## A

Section 245(i) of the Immigration and Nationality Act permits certain persons who entered the United States without inspection or otherwise violated their immigration status—and therefore would otherwise be ineligible to apply for adjustment of status from within the United States—to seek adjustment nonetheless if a petition was filed on their behalf prior to April 30, 2001, and they pay a $1,000 penalty. 8 U.S.C. § 1255(i)(1). If an alien satisfies these criteria, "the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if[:] (A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and (B) an immigrant visa is immediately available to the alien at the time

the application is filed." § 1255(i)(2). Although beneficiaries of petitions properly filed and approved under § 245(i) were grandfathered if their visas were not immediately available, "[a]n alien's nonimmigrant status is not affected by the fact that he or she is a grandfathered alien." 8 C.F.R. § 245.10(l). What is grandfathered, in other words, is the basic eligibility for adjustment; in all other respects the individual remains a "nonimmigrant"—that is, a person with no legal right to remain in the United States unless and until an immigrant visa becomes available.

Hadayat argues that this interpretation, which means that he is still subject to removal despite the approval of his brother's petition, "defeats the very purpose and intent" of § 245(i). An approved visa petition under § 245(i), however, is "not a visa, but, rather, is merely a preliminary step in the visa application process. It does not guarantee that a visa will be issued, nor does it grant the alien any right to remain in the United States." *Labojewski v. Gonzales*, 407 F.3d 814, 822 (7th Cir. 2005) (quotation marks omitted). In other words, as a grandfathered alien, Hadayat was eligible to adjust his status at some future date when a visa became available, but he was not sheltered from being removed from the United States in the meantime.

Admittedly, it might seem as if the government is being allowed to renege on its end of the § 245(i) "deal"—after all, it has taken the alien's money, knowing that she is, or soon will be, out-of-status, in exchange for holding her place in the visa line, and then turns around later and acts to remove her for having overstayed her visa. We have commented before on the confusing, if not mislead-ing, nature of similar aspects of this system, as it may be perceived by foreigners who often lack a sophisticated understanding of the U.S. legal system or fluency in English. See *Ahmed v. Dep't of Homeland Security,* 328 F.3d 383 (7th Cir. 2003). Nevertheless, a close look at the rules shows that the government has made no promises during

the visa process that it is not prepared to keep. The immediate availability of a visa is a statutory prerequisite to adjustment of status, but then adjustment of status is a matter committed to the discretion of the Attorney General. See *Singh v. Gonzales*, 404 F.3d 1024, 1028 (7th Cir. 2005); 8 U.S.C. § 1255(a). Nothing prohibits the Attorney General from strictly enforcing § 245(i)'s immediate visa availability requirement.

Hadayat argues that our decision in *Subhan* is to the contrary, but our holding in that case is not as broad as he contends. Although *Subhan* involved a petition filed under § 245(i), we held only that the IJ's denial of a continuance "without giving a reason consistent with the statute (indeed without giving any reason)" required a remand. 383 F.3d at 595. Indeed, we stressed in *Subhan* that a different result would have been required if the IJ had given any reason whatsoever for his action "consistent with the adjustment-of-status statute." *Id.* at 593-94. In Hadayat's case, the IJ gave two specific reasons for denying the motion to reopen: first, no visa was immediately available, and second, Hadayat had failed to comply with the voluntary departure order. *Subhan*, therefore, does not support Hadayat's petition for review.

Nor does the BIA's decision in *Matter of Velarde-Pacheco*, 23 I&N Dec. 253 (BIA 2002), offer much help for Hadayat's claim. In that case, the BIA held that a properly filed motion to reopen, seeking adjustment of status based on a marriage petition, may be granted "in the exercise of discretion" as long as certain specified criteria are met. *Id.* at 256. The BIA based its decision in part on its reading of "Congress' legislative intent in amending the marriage fraud provisions: that aliens who marry after proceedings have been initiated, and who seek adjustment of status, should be afforded one opportunity to present clear and convincing evidence that their marriage is bona fide." *Id.* at 257. Hadayat seems to argue that the fact that the

BIA treats marriage applications with relative liberality means it must do the same for his petition. But nothing in the statute requires this type of parity. Since Congress has expressed its desire to treat marriage petitions differently from other family petitions, see, *e.g.*, 8 U.S.C. § 1154, it is not unreasonable for the BIA to establish special procedures for the consideration of marriage petitions.

**B**

Hadayat next contends that his failure to comply with the voluntary departure order should not render him ineligible to adjust his status, arguing that the departure period should have been stayed pending the resolution of his motion to reopen. Although the unavailability of a visa constituted a sufficient ground for the BIA to affirm the IJ's denial of the motion to reopen, whether Hadayat violated the voluntary departure order is relevant to whether his future admission to the United States is barred. We therefore discuss the issue briefly.

"Voluntary departure confers substantial benefits compared with involuntary removal, and this difference provides an incentive to depart without dragging out the process and without requiring the agency and courts to devote resources to the matter." *Alimi v. Ashcroft*, 391 F.3d 888, 892 (7th Cir. 2004). One such benefit is that "[a]n alien who departs voluntarily may obtain a visa immediately, if eligible for one," whereas "[a]n alien removed from the United States cannot obtain a visa to return for at least five years." *Id.* (citing 8 C.F.R. § 212.2(a)). But what effect would voluntary departure have on an individual like Hadayat, who has an approved I-130 petition filed under § 245(i), but not an immediately available visa? At oral argument (and in a post-argument order) we asked the Attorney General to address this question. The government responded that once such an individual is placed in removal proceedings, her

visa application will be deemed abandoned when she leaves the United States, even if she voluntarily departs. See 8 C.F.R. § 245.2(a)(4)(ii)(A). Such an individual can, however, file a new visa petition from her home country without facing any bars to admissibility, in the Attorney General's opinion.

Rather than comply with the voluntary departure order, of course, Hadayat remained in the United States. He now wants us to hold that his departure order was automatically stayed by his motion to reopen. This position is flatly inconsistent with a long-held position of the BIA to the contrary. See *Matter of Shaar*, 21 I&N Dec. 541 (BIA 1996). That alone may not be dispositive; in fact, although we have never faced the issue, several of our sister circuits have rejected *Matter of Shaar*, which was based on a previous version of the law, as inconsistent with the current statutory scheme. See *Kanivets v. Gonzales*, 424 F.3d 330, 335 (3d Cir. 2005); *Sidikhouya v. Gonzales*, 407 F.3d 950, 952 (8th Cir. 2005); *Barroso v. Gonzales*, 429 F.3d 1195, 1205 (9th Cir. 2005); *Ugokwe v. U.S. Attorney Gen.*, 453 F.3d 1325 (11th Cir. 2006); but see *Banda-Ortiz v. Gonzales*, 445 F.3d 387, 391 (5th Cir. 2006) (holding that filing of motion to reopen does not automatically toll voluntary departure period). We need not reach this question, however, because Hadayat failed to depart even after the IJ denied his motion to reopen on an independent ground and the BIA rejected his appeals, nor did Hadayat seek a stay tolling his time for voluntary departure from this court, as is permitted by *Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 654 (7th Cir. 2004). No court goes so far as to hold that an alien may simply disregard a voluntary departure order while pursuing a petition for review in federal court; indeed, 8 U.S.C. § 1252(b)(3)(B) explicitly states that "[s]ervice of the petition [for review] . . . does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." Thus, whether or not *Matter of*

*Shaar* remains good law, Hadayat's failure to comply with his voluntary departure order after the BIA acted renders him ineligible for the benefits associated with voluntary departure.

**C**

Finally, Hadayat argues that the NSEERS program violated equal protection and that he was unconstitutionally targeted for registration and removal based on his ethnicity and religion. He notes, accurately, that while Indonesian nationals were required to register with DHS, "[a] person in the same situation . . . but not from one of the [NSEERS] enumerated countries would not have been placed in removal proceedings."

The government responds that since Hadayat failed to raise this claim before the BIA we are barred from reviewing it. Although a petitioner is generally required to exhaust administrative remedies with the BIA before raising an issue in a petition for review, see 8 U.S.C. § 1252(d), there is an exception for claims the BIA itself is powerless to address, such as "fundamental constitutional claims." *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004); *Matter of Valdovinos,* 18 I&N Dec. 343, 345 (BIA 1982). When constitutional claims "involve procedural errors correctable by the BIA, applicants must raise such claims as part of their administrative appeal." *Capric*, 355 F.3d at 1087. Hadayat contends that the substance of the regulation, the targeted registration requirements, violates equal protection, not just that the BIA has violated due process in implementing the regulation. This is the type of fundamental constitutional claim the BIA does not address. *Cf., Matter of Rodriguez-Carrillo*, 22 I&N Dec. 1031, 1035 (BIA 1999) (declining to pass on the constitutionality of provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996). Hadayat was therefore not required to exhaust.

The government also contends that we lack jurisdiction over Hadayat's challenge to NSEERS for a second reason: that his claim challenging the Attorney General's decision to issue him an NTA is barred by 8 U.S.C. § 1252(g), which prohibits federal courts from "hear[ing] any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." In *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), a case brought on behalf of several men affiliated with the Popular Front for the Liberation of Palestine targeted for deportation based on routine immigration violations, the Supreme Court held that § 1252(g) bars most selective prosecution claims brought by aliens, explaining that "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491-92. In short, the Court stated, "deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis in original).

Although *American-Arab Anti-Discrimination Committee* leaves open a narrow exception for the "rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.*, Hadayat's conclusory comments regarding the allegedly discriminatory effect of NSEERS do not come close to meeting this high burden. We therefore lack jurisdiction to review Hadayat's challenge to the registration program under § 1252(g).

## III

Accordingly, we DENY Hadayat's petition for review.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*