# United States Court of Appeals

## For the First Circuit

No. 05-2523

ABDELAZIZ KANDAMAR,

Petitioner,

v.

ALBERTO R. GONZALES, United States Attorney General,

Respondent.

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

_____

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Saris,* District Judge.

_____

William P. Joyce on brief for petitioner.
Leslie McKay, Senior Litigation Counsel, Office of Immigration
Litigation, U.S. Department of Justice, Peter D. Keisler, Assistant
Attorney General, and Linda S. Wernery, Assistant Director, on
brief for respondent.

_____

September 26, 2006

_____

* Of the District of Massachusetts, sitting by designation.

**SARIS, District Judge**.  Petitioner Abdelaziz Kandamar, a native and citizen of Morocco, seeks review of an order of the Board of Immigration Appeals ("BIA") dismissing an appeal of a final order of removal.  In its order, the BIA affirmed the decision of the Immigration Judge ("IJ") denying Petitioner's motion to suppress evidence taken by the Department of Homeland Security ("DHS")[1] at the special registration interview under the National Security Entry - Exit Registration System ("NSEERS").  Kandamar claims that NSEERS violated his equal protection and due process rights.  In the alternative, Kandamar asserts that the IJ erred in denying the application for voluntary departure because during the special registration DHS had taken Kandamar's expired passport, which was allegedly necessary to obtain a valid travel document.  After careful review of the record, we **DENY** the petition for review.

## I.   BACKGROUND

### A.   Facts and Procedural History

Petitioner Kandamar, a native and citizen of Morocco, entered the United States as a nonimmigrant B-2 visitor on April 28, 1999.  He was authorized to remain in the country until May 23, 1999.  Kandamar overstayed his visa.  He has no criminal history.

On August 12, 2002, the Department of Justice issued an NSEERS notice for the registration of certain young male

---

[1] As of March 1, 2003, the Immigration and Naturalization Service was dissolved and its functions were transferred to DHS. This opinion will refer to both agencies as DHS.

nonimmigrant aliens from designated countries, including Morocco. 67 Fed. Reg. 70526 (Nov. 22, 2002). The NSEERS notice required these nonimmigrants to appear before, register with, answer questions from, and present documents, including a passport and an I-94 card, to DHS. Id. at 70527. The NSEERS notice also specified that DHS conduct the interview under oath and record answers. Id.

On January 15, 2003, Kandamar reported to the John F. Kennedy Federal Building in Boston without counsel to comply with the special registration procedures under the newly-issued NSEERS notice. As instructed, he brought his passport, which had expired, and his I-94 departure record. DHS officers took these documents. At the conclusion of the interview, Kandamar was placed into removal proceedings and charged with removability under 8 U.S.C. § 1227(a)(1)(B) for remaining longer than permitted following admission as a nonimmigrant visitor. He was issued a Notice To Appear.

The IJ continued Kandamar's case twice so that he could retain counsel. On July 29, 2003, Kandamar appeared at a hearing with counsel, and the IJ continued the case again at the request of counsel. On August 11, 2003, Kandamar filed a three-page motion to suppress the evidence obtained by DHS "by unlawful search and seizure," alleging that NSEERS constitutes racial profiling and discrimination based on national origin; violates substantive due process because its use "to entrap nationals of certain countries" is fundamentally unfair; and violates equal protection by treating

legal and illegal entrants differently.

At the hearing on August 12, 2003, Kandamar denied removability. Kandamar's counsel challenged the constitutionality of NSEERS and, alternatively, asked for voluntary departure. Stating that Kandamar's passport had expired, he explained: "However, the Government has [his] passport and the Moroccan Consulate won't give him a new passport without the old passport." After setting a date for a hearing on the merits of the motion to suppress, the IJ returned to the issue of voluntary departure:

> Q. So again, at the conclusion of the merits hearing though, I will not be able to grant --
>
> A. I understand.
>
> Q. -- voluntary departure if he does not have a valid document, so --
>
> A. I mean, he can --
>
> Q. -- just so you're aware of that.
>
> A. -- somehow work it out with the Moroccans.
>
> Q. I don't know, but I'm just saying that, you know, those are the choices.
>
> A. No, I understand.

Kandamar's counsel did not ask for a return of the passport.

At the hearing on the motion to suppress on November 3, 2003, counsel stated that most of her arguments were in the brief, but complained that she had just received the government's opposition. The IJ inquired:

> Q. Well, you're saying that you're not ready to proceed on this opposition or do you have any additional arguments?
>
> A. Most of the arguments that I was going to bring up today were based on the brief, the motion that we already filed.

Q.    All right, okay.  And so, those are certainly
part of the record now unless there's anything
in addition to your motion.  Is there anything
in addition --

A.    No, Your Honor.

Q.    -- to the motion?  All right.

Denying the motion, the IJ held that the court "is not able to rule on the constitutionality of the regulations," denied Kandamar's application for voluntary departure because he was not statutorily eligible for the relief due to the lack of any travel documents permitting entry to Morocco, and ordered that Kandamar be removed and deported to Morocco.

Kandamar appealed to the BIA, alleging that the IJ erred in denying the application for voluntary departure, that the motion to suppress should have been granted because NSEERS is unconstitutional, and that the IJ should have conducted a factual inquiry into what transpired at the NSEERS interview and the circumstances of the seizure of Petitioner's documents.  He specifically challenged the special registration interview because he was not notified of his right to representation.

On September 7, 2005, the BIA declined to address the challenge to NSEERS because "the Board is not empowered to rule on the constitutionality of the statutes and regulations that we administer."  With respect to the appeal of the denial of the motion to suppress, it agreed with the IJ that Petitioner had not shown that the government's conduct was egregious, warranting the

application of the exclusionary rule to immigration proceedings under <u>INS</u> v. <u>Lopez-Mendoza</u>, 468 U.S. 1032, 1051 n.5, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984), and dismissed the appeal.

Kandamar challenges the denial of both the motion to suppress and the application for voluntary departure.

## II.  DISCUSSION

### A.  Voluntary Departure

Kandamar petitions for review of the IJ's denial of his application for voluntary departure.  Kandamar criticizes the BIA because, in reviewing the IJ's denial of the request for voluntary departure, it did not consider the fact that Petitioner lacked a valid passport because DHS had seized it.  Kandamar also criticizes the IJ for adjudicating his eligibility for post-hearing voluntary departure after a "very brief hearing" with inadequate reasoning.  Specifically, he contends that the IJ initially indicated that she would permit voluntary departure and did not explain what changed her mind.  These issues were properly raised first with the BIA.

Pursuant to 8 U.S.C. § 1229c(b), the "Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a [removal] proceeding . . . the immigration judge enters an order granting voluntary departure in lieu of removal and" makes certain findings, including that the alien has established by clear and convincing evidence that "the alien has the means to depart the United States and intends to do so."  Section 1229c specifically states that "[n]o

court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure." Id. § 1229c(f); see also 8 C.F.R. § 240.25. Moreover, § 1252(a)(2)(B) provides that no court shall have jurisdiction to review any judgment regarding the granting of relief under 8 U.S.C. § 1229c. Thus, this court lacks authority to review a refusal to allow voluntary departure. Karim v. Gonzales, 424 F.3d 109, 111-12 (1st Cir. 2005).

Petitioner seeks to circumvent this jurisdictional bar by claiming that the IJ gave him an inadequate hearing on his claim that his passport was unfairly taken from him at the NSEERS interview and that her reasoning was insufficient. "A due process claim requires that a cognizable liberty or property interest be at stake." DaCosta v. Gonzales, 449 F.3d 45, 50 (1st Cir. 2006) (citation omitted). Discretionary forms of relief do "not rise to the level of such a protected interest." Id. (adjustment of status) (citation omitted). Thus, to the extent Petitioner seeks to paint his claim in due process colors, that claim will not succeed because voluntary departure is a "privilege, not a right." Jupiter v. Ashcroft, 396 F.3d 487, 492 (1st Cir.) (citation omitted), cert. denied, 126 S. Ct. 427, 163 L. Ed. 2d 325 (2005). In any event, the IJ succinctly explained that the lack of a passport or any other travel document precluded voluntary departure. No greater hearing or rationale was necessary on the point.

Kandamar's primary protest is that the DHS improperly

seized his passport at the special registration. The issue is poorly vetted in the record as the government does not cite any legal authority to support the seizure of the passport. While the special registration regulations authorize the government to require the immigrant to provide "information or documentation confirming compliance with his or her visa and admission," 8 C.F.R. § 264.1(f)(4)(ii), which presumably includes the passport, they do not authorize seizure of the passport.[2] Even assuming the expired passport were improperly seized, as opposed to inspected, at the NSEERS interview, there is no evidence in the record from January 15, 2003, when the passport was taken from him, until the merits hearing on November 3, 2003, that Kandamar timely sought the return of his passport. While he alerted the IJ to the fact DHS seized the passport, he did not urge the IJ to order DHS to return it, although he knew a travel document would have to be produced at the merits hearing. Karim, 424 F.3d at 111 (denying voluntary departure where passport was seized at a special registration but alien did not request return from IJ). Moreover, the bare-bones allegation that Morocco would not renew the passport without the presentation of the expired one does not demonstrate that diligent efforts were made before the removal hearing to secure one. See 8 C.F.R. § 1240.26.

---

[2] In contrast, under another regulation governing voluntary departures, an authorized officer may inspect, photocopy, and hold a passport "for sufficient time to investigate its authenticity" as a condition to the granting of voluntary departure. See 8 C.F.R. § 240.25(b) (2002).

**B. Other Due Process Claims**

Kandamar raises a multi-pronged attack on NSEERS, arguing that the evidence obtained from the NSEERS interview should be suppressed because NSEERS, both facially and as applied to him, is fundamentally unfair in violation of the Fourth and Fifth Amendments. Legal conclusions are reviewed de novo, including alleged errors related to due process claims. Settenda v. Ashcroft, 377 F.3d 89, 92-93 (1st Cir. 2004).

In the immigration context, the Supreme Court has left open only a "glimmer of hope of suppression." Navarro-Chalan v. Ashcroft, 359 F.3d 19, 22 (1st Cir. 2004). Specifically, the Supreme Court has concluded

> that the cost of the exclusionary rule generally outweighs its benefits in the context of civil deportation hearings. The Court thus held that the exclusionary rule generally should not apply in that context, but may have left the door open in cases of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."

Id. at 22-23 (quoting INS v. Lopez-Mendoza, 468 U.S. 1032, 1050-51, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984)). In setting forth that rule, the Supreme Court noted favorably the BIA holding that "evidence will be excluded if the circumstances surrounding a particular arrest and interrogation would render use of the evidence obtained thereby 'fundamentally unfair' and in violation of due process requirements of the Fifth Amendment." Id. at 151 n.5 (citing Matter of Toro, 17 I & N Dec. 340, 343 (1980)). We

examine Kandamar's claims to determine whether there is evidence of an "egregious violation" of the Fourth Amendment or other liberties.

To begin, Kandamar claims that his due process rights were violated because he was not given the option of having counsel present at the NSEERS interview. Kandamar did not present this argument to the IJ either in his motion to suppress or at the hearing. While he did present the argument to the BIA, the BIA did not expressly address it. By regulation, Kandamar does have a right to be represented by counsel at examinations by immigration officers, such as the NSEERS special registration. "[W]henever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney." 8 C.F.R. § 292.5(b). While the regulations do provide that the alien be notified of his right to counsel (at no expense to the government) and be given a list of free legal services at a deportation hearing, see id. § 246.5(b), Kandamar received this notification. However, he does not point to any parallel regulation that requires that an immigration examiner similarly explain the right to representation at the special registration interview, although it would seem to be a better practice. There is no evidence that Kandamar was precluded from having counsel present at his interview.

Next, although the argument is not clear-cut, Kandamar argues that the NSEERS special registration was so coercive that a

reasonable person would have believed that he was not free to leave. We have held that in some circumstances, statements by an arrested alien can be involuntary and coerced in violation of the Due Process Clause of the Fifth Amendment. See Navia-Duran v. INS, 568 F.2d 803, 808 (1st Cir. 1977) (reversing a deportation order where statements of alien were coerced in violation of the Due Process Clause). Kandamar claims that DHS's restraint violated the regulation governing administrative detention under 8 C.F.R. § 287.8(b)(1) because the inherent nature of special registration creates an atmosphere where a reasonable person would conclude he is not free to leave. Section 287.8(b) provides:

> Interrogation is questioning designed to elicit specific information. An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.

8 C.F.R. § 287.8(b). Kandamar did not squarely present this argument that his interview was so coercive as to be tantamount to detention to either the IJ or the BIA. A petitioner is generally required to exhaust administrative remedies with the BIA before raising an issue in a petition for review of a final order of removal. See 8 U.S.C. § 1252(d)(1); Olvjore v. Gonzales, 411 F.3d 16, 23 (1st Cir. 2005). We have indicated that, in rare circumstances, an asserted denial of due process may be exempt from the ordinary exhaustion requirement, for example, where the claim is beyond the authority of the agency to adjudicate. DaCosta v. Gonzales, 449 F.3d 45, 49 (1st Cir. 2006). When constitutional

claims "involve procedural errors correctable by the BIA, applicants must raise such claims as part of their administrative appeal." Capric v. Ashcroft, 355 F.3d 1075, 1087 (7th Cir. 2004). As such, Kandamar failed to exhaust his administrative remedies to preserve his claim.

Kandamar also argues that the IJ should have granted him a hearing about what transpired at the special registration, an issue that was argued to the BIA. Kandamar did not proffer any specific evidence of any government misconduct by threats, coercion or physical abuse to the IJ or the BIA with regard to his NSEERS interview that would constitute egregious government conduct. There is no evidence that Kandamar asked to leave, was told he could not leave, or was restrained from leaving during the interview. The allegation of an intimidating atmosphere created by armed guards seems to be gleaned from an unpublished case in another jurisdiction rather than Petitioner's own personal experience. Most importantly, immigration counsel did not request an evidentiary hearing before the IJ but rested on her brief, which did not raise this claim at all.

Kandamar's most interesting due process claim is the poorly developed argument made to the BIA that NSEERS is fundamentally unfair because it violates the equal protection principles embodied in the Fifth Amendment, contending that it only affects nationals of certain countries and thus constitutes blatant

racial profiling.[3]  This is the type of fundamental constitutional claim the BIA is powerless to address.  Hadayat v. Gonzales, --- F.3d ----, 2006 WL 2347365, at *5 (7th Cir. August 15, 2006).

The Due Process Clause of the Fifth Amendment contains an equal protection safeguard.  See Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S. Ct. 693, 98 L. Ed. 884 (1954); Rodriguez-Silva v. INS, 242 F.3d 243, 246 (5th Cir. 2001).  We have held that aliens are entitled to equal protection of the law under the Fifth Amendment.  See Viera García v. INS, 239 F.3d 409, 414 (1st Cir. 2001) (applying a rational basis for review to an equal protection analysis involving a non-race based classification).

However, Congress may permissibly set immigration criteria based on an alien's nationality or place of origin.  The Supreme Court has long held that judicial review of line-drawing in the immigration context is deferential.  See INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S. Ct. 1439, 143 L. Ed. 2d 590 (1999) (noting "we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context" (citation omitted)); Fiallo v. Bell, 430 U.S. 787, 792, 97 S. Ct. 1473, 52 L. Ed. 2d 50 (1977) ("This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of

---

[3] While Kandamar's original motion to suppress also argued that NSEERS violated equal protection by treating legal and illegal entrants to the United States differently, Kandamar does not press this argument on appeal.  The Court does not address it.

aliens." (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S. Ct. 671, 53 L. Ed. 1013 (1909))).  We have similarly stated:

> Nowhere is the scope of judicial inquiry more limited than in the area of immigration legislation.  Indeed, the Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  The political character of this intrinsically executive function renders it "subject only to narrow judicial review."

Adams v. Baker, 909 F.2d 643, 647 (1st Cir. 1990) (citations omitted).

The Supreme Court has not had occasion to address directly the level of scrutiny that pertains to an equal protection challenge based on national origin in the immigration context.  In Nguyen v. INS, 533 U.S. 53, 121 S. Ct. 2053, 150 L. Ed. 2d 115 (2001), the Supreme Court held that a statute that imposed different requirements for a child's acquisition of citizenship depending on the gender of the citizen parent did not violate the equal protection guarantee embodied in the Due Process Clause of the Fifth Amendment.  Finding that the statute's gender-based "classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives,'" it declined to "decide whether some lesser degree of scrutiny pertains [in an equal protection challenge] because the statute implicates Congress' immigration and naturalization power."  Id. at 60-61 (citations

omitted).

Congress has given the Attorney General great latitude in setting special registration requirements. 8 U.S.C. § 1305. Section 1305(b) provides:

> The Attorney General may in his discretion, upon ten days notice, require the natives of any one or more foreign states, or any class or group thereof, who are within the United States and who are required to be registered under this title, to notify the Attorney General of their current addresses and furnish such additional information as the Attorney General may require.

See also id. § 1303(a) (authorizing the Attorney General to prescribe special regulations and forms for the registration of "aliens of any other class not lawfully admitted to the United States for permanent residence").

The rationale for establishing NSEERS is set forth in the Federal Register as follows:

> Recent terrorist incidents have underscored the need to broaden the special registration requirements for nonimmigrant aliens from certain designated countries, and other nonimmigrant aliens whose presence in the United States requires closer monitoring, to require that they provide specific information at regular intervals to ensure their compliance with the terms of their visas and admission, and to ensure that they depart the United States at the end of their authorized stay. On June 13, 2002, the Department published a proposed rule to modify the regulations to require certain nonimmigrant aliens to make specific reports to the Immigration and Naturalization Service; upon arrival, approximately 30 days after arrival; every twelve months after arrival; upon certain events, such as a change of address, employment, or school; and at the time they leave the United States. This final rule adopts the proposed rule without substantial change.

<u>Registration and Monitoring of Certain Nonimmigrants</u>, 67 Fed. Reg. 52584 (Aug. 12, 2002).  On November 22, 2002, "[i]n light of recent events, and based on intelligence information available to the Attorney General," the Attorney General designated that certain adult males who were nationals and citizens from Morocco and other countries were subject to NSEERS.  67 Fed. Reg. 70526 (Nov. 22, 2006).

Petitioner argues in conclusory fashion that the classification based on national origin violates equal protection principles.  Every court to address the issue has rejected a challenge to NSEERS registration on equal protection grounds.  <u>See</u> <u>Ahmed</u> v. <u>Gonzales</u>, 447 F.3d 433, 439-40 (5th Cir. 2006); <u>Ali</u> v. <u>Gonzales</u>, 440 F.3d 678, 681 n.4 (5th Cir. 2006); <u>Zafar</u> v. <u>U.S.</u> <u>Attorney Gen.</u>, --- F.3d ----, 2006 WL 2440044, at *10-11 (11th Cir. January 24, 2006); <u>Roudnahal</u> v. <u>Ridge</u>, 310 F. Supp. 2d 884, 892 (N.D. Ohio 2003).  Possibly, the events of September 11, 2001, and terrorist activities around the world, inform the degree of scrutiny to be applied, but we in any event give deference to the Attorney General's requirement that young males from certain countries be subject to special registration.  We hold that a special registration system serves legitimate government objectives of monitoring nationals from certain countries to prevent terrorism and is rationally related to achieving these monitoring objectives. <u>See</u> <u>Narenji</u> v. <u>Civiletti</u>, 617 F.2d 745, 747 (D.C. Cir. 1979) (finding there was a rational basis for the special registration of

Iranian students after the taking of hostages in the United States embassy in Iran).

It is worth emphasizing that the decision to remove Petitioner was based on the fact that he had overstayed his visa, not based on his national origin. To be sure, Moroccan nationals were required to register with DHS while a person in the same situation but not from one of the NSEERS countries would not have been placed in removal proceedings. However, a claim of selective enforcement based on national origin is virtually precluded by Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999) (involving Palestinians affiliated with a political group targeted for deportation for routine immigration violations). In Reno, the Supreme Court held that courts lack jurisdiction under 8 U.S.C. § 1252(g) over most selective prosecution claims: "When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." Id. at 491-92. The Supreme Court did, however, leave open "the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." Id. at 491. The Seventh Circuit recently rejected a similar selective prosecution equal protection challenge to NSEERS, finding it lacked jurisdiction to review the basis for enforcement under 8 U.S.C. §

1252(g) because the petitioner failed to show that the NSEERS program lacked the requisite outrageousness. See, e.g., Hadayat v. Gonzales, 2006 WL 2347365 at *6. There is nothing in this record to demonstrate outrageous discrimination.

Finally, in a twist on an earlier contention, Petitioner asserts that the evidence derived from the examination, specifically from the passport, should be suppressed because the seizure was a violation of the Fourth Amendment and was fundamentally unfair. While the seizure is troubling because the government has cited no legal authority for holding the passport, Kandamar has not demonstrated any prejudice resulting from the seizure that would warrant reversal of the removal order here. In this case, Kandamar admitted his identity at each of the IJ hearings. The government had a copy of Kandamar's I-94 departure record, which establishes Kandamar's temporary admission into the United States and his overstay, in its own files. Certainly, there can be little doubt about DHS's authority to inspect and photograph the passport and other documentation. Therefore, in light of the availability of untainted government records and lack of egregious government misconduct, any error that occurred from a seizure would be harmless. Karim, 424 F.3d at 112.

### III.  CONCLUSION

The petition for review is denied.