# United States Court of Appeals
## For the First Circuit

No. 14-1185

MARIA LETICIA GARCIA-AGUILAR,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General of the United States,*

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Souter,** <u>Associate Justice</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Anant K. Saraswat</u>, with whom <u>Mark C. Fleming</u> and <u>Wilmer Cutler Pickering Hale and Dorr LLP</u> were on brief, for petitioner.
<u>John W. Blakeley</u>, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Department of Justice, <u>Joyce R. Branda</u>, Acting Assistant Attorney General, Civil Division, <u>Francis W. Fraser</u>, Senior Litigation Counsel, and <u>Jem C.</u>

---

* Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Loretta E. Lynch has been substituted for former Attorney General Eric H. Holder, Jr. as respondent.
** Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Sponzo, Trial Attorney, Office of Immigration Litigation, Civil Division, on brief for respondent.

Kevin P. Martin, Jamie A. Santos, and Goodwin Procter LLP on brief for the Consulate General of México, amicus curiae in support of petitioner.

Melissa Crow, American Immigration Council, Kate Desormeau, Omar C. Jadwat, American Civil Liberties Union Foundation Immigrants' Rights Project, Matthew E. Price, Jenner & Block LLP, Matthew R. Segal, and Adriana Lafaille on brief for American Immigration Council, American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of Massachusetts, amici curiae in support of petitioner.

---

November 25, 2015

---

**HOWARD**, **Chief Judge**. Acting on an alleged tip that undocumented aliens were employed there, Immigration and Customs Enforcement ("ICE") agents raided the Michael Bianco, Inc. factory in New Bedford, Massachusetts. Petitioner Marcia Garcia-Aguilar was detained during that raid. She argues that her arrest and detention involved constitutional violations sufficiently egregious to warrant the suppression of evidence introduced during her subsequent removal proceedings. Because we conclude that one of those pieces of evidence -- Garcia's birth certificate -- was not tainted by any alleged constitutional violations, and since that birth certificate is sufficient to prove her alienage, we deny the petition for review.

## I.

The raid occurred at approximately 8:30 AM on March 6, 2007. As ICE agents entered the factory, the factory's secretary directed employees to remain in place. Garcia states in an affidavit that she immediately attempted to call her son's babysitter, but that an ICE agent confiscated her cell phone. She attests that four ICE agents then approached a group of factory workers, including Garcia. When one of those workers attempted to flee, an agent grabbed him, forced him to sit down, and handcuffed him. Garcia states that she was thereafter handcuffed with plastic ties and claims that she was asked for her name only after being handcuffed. Garcia and other workers were escorted to the

- 3 -

factory's cafeteria and photographed.  Later, the workers were placed on a bus with blackened windows and driven ninety-five miles to Fort Devens military base without being informed where they were going.

Once at Fort Devens, an ICE agent questioned Garcia. The substance of that interview was memorialized in an I-213 Form, a standard government form that documents biographical and factual information about a deportable or inadmissible alien.  The I-213 Form states that Garcia is a Mexican citizen and paid a smuggler to transport Garcia and her son to the United States in 2005.

Two days later, on March 8, Garcia was transferred to the Bristol County Correctional Facility.  That same day, the Consul General of Mexico in Boston, Porfirio Muñoz-Ledo, sent a fax to the director of ICE's Boston field office, Bruce Chadbourne. Muñoz-Ledo included the Mexican birth certificates of Garcia and her son with that fax.  In a cover letter he wrote:

> I would like to bring to your attention the case of Ms. Maria Leticia Garcia Aguilar, Mexican National . . . detained last Tuesday in New Bedford, Massachusetts, who has a 2 year[] old child . . . .
> It is our understanding that Mrs. Garcia Aguilar has been housed at Devens with other Mexican Nationals detained during the Tuesday raid, but will remain under ICE Custody until an Immigration Court date be set.
> Since we were informed that Mrs. Maria Leticia Garcia Aguilar['s] child has been under [a neighbor's care], I will appreciate if you could check on the case and see [to] the possibility of releasing her under the

- 4 -

conditions you consider appropriate, so Mrs. Garcia Aguilar could take care of her child while waiting for the decision of an Immigration Judge.

Garcia was released after five days at the Bristol County Correctional Facility.[1]

Garcia was served with a Notice to Appear in removal proceedings while detained at Fort Devens. Through written pleadings filed on October 30, 2007, Garcia denied the Notice to Appear's factual allegations and denied removability as charged. She later filed a motion to suppress the I-213 Form, arguing that the statements contained therein were obtained in violation of her Fourth and Fifth Amendment rights and governing DHS regulations. An Immigration Judge ("IJ") orally denied the motion, but the Bureau of Immigration Appeals ("BIA") remanded the matter for the IJ "to clarify, through fact finding, what occurred during [Garcia's] arrest." On remand, Garcia testified before the IJ, and the government introduced Garcia's and her son's birth certificates. When questioned about those birth certificates and about her alienage, Garcia invoked her Fifth Amendment right to remain silent.

---

[1] Because we conclude that the government permissibly introduced Garcia's birth certificate in her removal proceedings, we do not canvass the full extent of Garcia's allegations about her arrest and ensuing detention.

- 5 -

The IJ concluded that the birth certificate "independently established [Garcia's] identity and alienage" regardless of whether she had "established egregious misconduct by ICE officers" that would warrant suppression of her I-213 Form. Nevertheless, the IJ further found that Garcia failed to establish a prima facie case of egregious constitutional violations. The BIA affirmed, primarily on the ground that Garcia had failed to show egregious violations of her constitutional rights, but also noted that "the DHS obtained [Garcia's] birth certificate and independently confirmed her alienage and identity." This petition for review followed.

## II.

Thirty years ago the Supreme Court held that the exclusionary rule typically does not apply in civil deportation proceedings. See I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1042-50 (1984). In the Court's assessment, because there "is no convincing indication" that applying the exclusionary rule "will contribute materially" to deterring INS misconduct, the social costs of extending the exclusionary rule to civil deportation proceedings outweigh the benefits of applying the rule. Id. at 1046. At the same time, the Court left open a "glimmer of hope of suppression." Navarro-Chalan v. Ashcroft, 359 F.3d 19, 22 (1st Cir. 2004). The Court suggested that suppression may be warranted where there have been "egregious violations of Fourth Amendment or other liberties

that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." Lopez-Mendoza, 468 U.S. at 1050-51.[2]

Invoking this potential limit to Lopez-Mendoza's holding, Garcia contends that the circumstances of her arrest and the conditions of her detention constitute egregious violations of her Fourth and Fifth Amendment rights. As a result, she claims that the BIA and IJ erred in refusing to suppress both the I-213 Form and her birth certificate. The government responds that Garcia has not made a prima facie showing of egregious constitutional violations. It further argues that, regardless, the agency correctly concluded that Garcia's birth certificate established her alienage independent of any such violations. The government's second argument is persuasive.

We review de novo the BIA's ultimate legal determination that Garcia's birth certificate was obtained independent of any constitutional violations and, thus, was not suppressible as fruit

---

[2] The Court also noted that its "conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread." Lopez-Mendoza, 468 U.S. at 1050. While only a plurality of the Court directly endorsed these two potential limitations, four dissenting Justices would have found the exclusionary rule generally applicable in civil deportation proceedings. Thus, as other circuits have, we read Lopez-Mendoza to suggest that a clear majority of the Court would apply the exclusionary rule in either of these situations. Accord, e.g., Puc-Ruiz v. Holder, 629 F.3d 771, 778 n.2 (8th Cir. 2010).

of the poisonous tree.  See Soto-Hernandez v. Holder, 729 F.3d 1, 3 (1st Cir. 2013) (reviewing the BIA's legal conclusions de novo); United States v. Faulkingham, 295 F.3d 85, 90 (1st Cir. 2002) (determining "anew" whether evidence should be suppressed).  Where evidence is not obtained as the direct result of an illegal search, but may have been derived from the fruits of that initial search, we must determine "whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." United States v. Crews, 445 U.S. 463, 471 (1980).

Importantly, more than half a century ago the Supreme Court definitively rejected the idea that "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963) (emphasis added).  As the Court has since reiterated, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence."  Hudson v. Michigan, 547 U.S. 586, 592 (2006).  Instead, for suppression to be warranted there also must be some indication that government actors took advantage of the initial illegality to obtain the challenged evidence.  Wong Sun, 371 U.S. at 488.  We ask whether, "granting establishment of the primary illegality, the evidence to which instant objection is

- 8 -

made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (citation omitted).

Particularly where evidence is obtained from third parties, as Garcia's birth certificate was here, several considerations may be relevant, including: whether the government otherwise would "have known the identity of [the] third parties [or] what to ask them"; whether the government "anticipated that the illegal search would help lead it to" those third parties; and whether third parties nevertheless "would have come forward on their own had the [government] not sought them out." United States v. Finucan, 708 F.2d 838, 844 (1st Cir. 1983). Of particular pertinence is the "degree of free will" exercised by those who "come forward and offer evidence entirely of their own volition." United States v. Ceccolini, 435 U.S. 268, 276 (1978).

Here, Garcia argues that her birth certificate should have been suppressed because it was obtained by ICE "as a consequence of" her unlawful detention. Even assuming Garcia's arrest and detention involved egregious constitutional violations, however, her argument boils down to the singular assertion that the Mexican Consulate "would not have sent the birth certificates to ICE had ICE not arrested [her]." That claim is a simple "but for" argument. It may well be that Garcia's detention impelled the Mexican Consulate to proffer her birth certificate to ICE.

But Garcia points to nothing in the record suggesting that the government exploited the purported illegalities to obtain her birth certificate. Indeed, Garcia's counsel forthrightly acknowledged at oral argument that there is no indication that the government even notified the consulate Garcia had been detained. Instead, the Mexican Consulate appears to have independently learned of Garcia's detention and sent the birth certificate to ICE entirely of its own volition. To nevertheless find Garcia's birth certificate tainted in these circumstances would require us to reject the Supreme Court's repeated admonition that all evidence "which somehow came to light through a chain of causation that began with an illegal arrest" is not rendered per se inadmissible. Id. at 276.

Because suppression of Garcia's birth certificate was not required, the government was able to prove Garcia's alienage in this case "using evidence gathered independently of, or sufficiently attenuated from, the original arrest" and without resorting to the I-213 Form. Lopez-Mendoza, 468 U.S. at 1043. Garcia did not contest the validity or authenticity of the birth certificate before the IJ, and the document suffices without more to prove her alienage. Moreover, because an IJ may draw an adverse inference from an alien's invocation of the Fifth Amendment during removal proceedings, see id. at 1043-44; Peña-Beltre v. Holder, 622 F.3d 57, 62 n.3 (1st Cir. 2010), the IJ was permitted to

conclude that Garcia's silence "fairly corroborate[d]" the birth certificate's authenticity, Matter of Guevara, 20 I. & N. Dec. 238, 243 (BIA 1990).[3]

As we affirm the BIA's decision based on evidence that was not tainted by any constitutional violations, we need not determine whether those purported violations were "egregious." Westover v. Reno, 202 F.3d 475, 479 (1st Cir. 2000).[4] Our holding should not, however, be taken to suggest that there necessarily were no constitutional violations here. See Aguilar v. U.S. Immigration & Customs Enf't, 510 F.3d 1, 24 (1st Cir. 2007) (urging

---

[3] Garcia urges two other independent grounds for suppressing her birth certificate. Both fail. First, Garcia claims that ICE violated a DHS regulation requiring that an alien be informed of her right to counsel. See 8 C.F.R. § 287.3(c). But even if ICE violated that regulation, and even if regulatory violations warrant suppression, contra Navarro-Chalan v. Ashcroft, 359 F.3d 19, 23 (1st Cir. 2004), Garcia's birth certificate is similarly untainted by any regulatory violation.

Second, Garcia invokes a separate DHS regulation that prohibits an IJ from considering in removal proceedings information gleaned only from the record of a bond proceeding. See 8 C.F.R. § 1003.19(d). This argument founders for several independent reasons, possibly including Garcia's failure to raise the issue below (although the government has not pressed waiver). In any event, it suffices to point out that, while the Mexican Consulate's cover letter advocated for Garcia's release, there is no indication in the record that the birth certificate was intended for use in, or was ever in fact introduced in, a bond proceeding.

[4] We also need not spell out precisely how we would assess whether constitutional violations are "egregious." Though we have previously noted some factors that we might find informative, see Kandamar v. Gonzales, 464 F.3d 65, 71 (1st Cir. 2006), we have not yet followed other circuits in establishing a particular test. Compare, e.g., Oliva-Ramos v. Att'y Gen. of U.S., 694 F.3d 259, 279 (3d Cir. 2012), with Orhorhaghe v. I.N.S., 38 F.3d 488, 493 (9th Cir. 1994).

ICE to "treat this [raid's] chiaroscuro series of events as a learning experience in order to devise better, less ham-handed ways of carrying out its important responsibilities").

## III.

The agency did not err in considering Petitioner's birth certificate as independent evidence of her alienage. Accordingly, the petition for review is **<u>denied</u>**.