**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LUZ LOPEZ-RODRIGUEZ; FABIOLA
GASTELUM-LOPEZ,
                        *Petitioners,*

            v.

MICHAEL B. MUKASEY, Attorney
General,

                        *Respondent.*

No. 06-70868

Agency Nos.
A78-184-178
A78-184-179

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 4, 2008—Pasadena, California

Filed August 8, 2008

Before: William C. Canby, Jr. and Jay S. Bybee, Circuit
Judges, and Justin L. Quackenbush,* Senior District Judge.

Opinion by Judge Canby;
Concurrence by Judge Bybee

*The Honorable Justin L. Quackenbush, Senior District Judge for the
Eastern District of Washington, sitting by designation.

10209

**COUNSEL**

Sara J. O'Connell, Morrison & Foerster, LLP, San Diego, California, for the petitioners.

Aviva L. Poczter, (briefs) and Song Park (oral argument), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

CANBY, Circuit Judge:

Fabiola Gastelum-Lopez ("Gastelum") and Luz Lopez-Rodriguez ("Lopez") petition for review of a decision of the Board of Immigration Appeals ("BIA") that affirmed an order of the Immigration Judge ("IJ") removing them to Mexico. They contend that the IJ and BIA erred in denying their joint motion to suppress their respective Forms I-213 (Record of Deportable/Inadmissible Alien) and a sworn statement by Gastelum, because the evidence contained in these documents was obtained in egregious violation of their Fourth Amendment rights. We agree that this evidence should have been suppressed. Because the government did not produce any other evidence tending to show the petitioners' alienage in the proceedings before the IJ, we grant the petition for review, reverse and remand.

**BACKGROUND**

In October 2000, the Immigration and Naturalization Service ("INS")[1] received a tip that a female by the name of Fabiola was fraudulently using a birth certificate belonging to Sugeyra Torres-Carillo, a citizen of the United States, to obtain employment. The tip also indicated that the suspect lived at a specified address in Fresno, California. Gastelum and Lopez, niece and aunt, resided at that address. Gastelum was seventeen years old at the time.

Three INS agents decided to act on the tip and visit the residence to investigate the matter. They did not obtain an arrest or search warrant prior to conducting their visit.[2] The circum-

---

[1]As of March 2003, INS became United States Citizenship and Immigration Services, an agency within the Department of Homeland Security.

[2]The record does contain a Warrant for Arrest of Alien for Lopez. This document, however, was served at "1711 hrs," 5:11 PM, on October 30,

stances surrounding the INS agents' entry into the residence were disputed, as we explain below. Ultimately, the IJ found that the agents entered without consent. Once inside, the three INS agents questioned Gastelum. They asked her whether she was "Sugeyra." She answered that she was. They asked her to provide the names of her parents. She complied.[3] They asked her where she had been born, and she responded that she was born in Texas. They asked where in Texas she was born, and she did not reply. They asked, "Who is Fabiola?" She said she was Fabiola. They immediately handcuffed her. The agents also arrested Lopez on suspicion of being an alien unlawfully present in the United States.[4]

While in INS custody, Gastelum and Lopez were questioned about, among other things, their country of origin and immigration status in the United States. On the basis of the information they obtained, the INS agents prepared individual Forms I-213, Record of Deportable/Inadmissible Aliens, for Gastelum and Lopez. The forms reflect what the INS agents believed to be the petitioners' biographical information and immigration status as well as a skeletal narrative of the arrest of each petitioner. According to the forms, both Gastelum and Lopez are natives and citizens of Mexico not authorized to be in the United States. The forms also show that neither Gastelum nor Lopez had a criminal record.

The INS agents also produced a Record of Sworn Statement by Gastelum. In her sworn statement, Gastelum

2000, well after the agents' entry into the residence on the morning of the same day. Moreover, the warrant reports an alleged date and place of entry into the United States that first became known to the INS agents during their interrogation of Lopez. The interrogation evidently took place after the events relevant to the motion to suppress.

[3]It is not clear whether she provided the names listed as Sugeyra's parents on the alleged fraudulent birth certificate or the names of her actual parents.

[4]The agents also arrested two males, who are not parties to this case.

acknowledged that she was a native and citizen of Mexico. She also admitted that she had received a birth certificate in the name of Sugeyra from a 43-year-old foreman, Francisco Lopez-Fuentes (Fuentes), who had supervised her when she worked in the fields. Fuentes did not ask Gastelum for any money in exchange for the birth certificate.

The government issued Notices to Appear in removal proceedings to both Gastelum and Lopez. In joint proceedings, Gastelum and Lopez moved to suppress the Forms I-213 as well as Gastelum's sworn statement. They submitted an affidavit by Gastelum asserting that she did not consent to the INS agents' entry into their home. In the Forms I-213, the INS agents asserted that she had in fact consented. The IJ required Gastelum to testify at the removal hearing in support of her motion to suppress. She testified that, when the agents arrived, she was asleep in her bedroom. Her aunt Lopez woke her up to let her know that some individuals were calling her. Gastelum went to the door, which was "slightly open and not locked," "opened it a little more and . . . peeked outside." She saw two men standing outside the door. They asked her if her name was "Sugeyra." She did not open the door for them and did not allow them to enter. She testified that the two men pushed the door and entered, accompanied by a third, female agent. Once inside, the agents proceeded to interrogate her as described above. After Gastelum answered several questions and was being handcuffed, the INS agents finally identified themselves.

After the direct examination of Gastelum and a brief cross-examination by the government, the IJ ruled that testimony by the INS agents was necessary to resolve the apparent conflict between Gastelum's testimony and the government's assertion that she had consented to the agents' entry. The hearing was continued. At the next hearing, the government did not produce any of the three agents involved in the raid. The IJ credited Gastelum's version of the events surrounding the entry and recognized "some 4th Amendment problems with

the manner of entering and questioning." She concluded, however, that the violations were not "so egregious as to fall under the [']fundamentally unfair['] line of cases that would suppress these events." She denied the motion to suppress and ordered Gastelum and Lopez removed.

Gastelum and Lopez appealed to the BIA, which affirmed the IJ's decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4). Gastelum and Lopez have filed this timely petition for review. We have jurisdiction pursuant to 8 U.S.C. § 1252.

## DISCUSSION

Where, as here, the BIA affirms the decision of the IJ without opinion, we review the IJ's decision. *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 815 (9th Cir. 2004). We review de novo constitutional challenges to removal orders. *E.g., Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000). Factual findings underlying an IJ's order are reviewed for substantial evidence. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003).

Gastelum and Lopez seek review of the IJ's denial of their motion to suppress the I-213 forms prepared by the INS and Gastelum's sworn statement. We conclude that, on the facts developed before the IJ, the evidence of alienage[5] contained in these documents was obtained in violation of Gastelum's and Lopez's Fourth Amendment rights and that the violation was "egregious." Because the government did not produce any other evidence tending to show the petitioners' alienage

---

[5]"[T]he INS must show only identity and alienage; the burden then shifts to the respondent to prove the time, place, and manner of his entry." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984). Because the identity of an alien in removal proceedings is "never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred," *id.*, the only suppressible evidence at issue here is that pertaining to alienage.

in the proceedings before the IJ, we grant their petition for review and reverse the order of removal.[6]

**[1]** In *INS v. Lopez-Mendoza*, the Supreme Court held that the Fourth Amendment exclusionary rule does not generally apply in deportation proceedings, where the sole issues are identity and alienage. 468 U.S. 1032, 1034 (1984). "However, the Court expressly left open the possibility that the exclusionary rule might still apply in cases involving 'egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained.' " *Orhorhaghe v. INS*, 38 F.3d 488, 492-93 (9th Cir. 1994) (quoting *Lopez-Mendoza*, 468 U.S. at 1050-51). We have since "t[aken] up the Supreme Court's suggestion" and "held that, even in administrative proceedings in which . . . the exclusionary rule [does not ordinarily apply], administrative tribunals are still required to exclude evidence that was 'obtained by deliberate violations of the Fourth Amendment or by conduct a reasonable officer should know is in violation of the Constitution.' " *Id.* at 493 (quoting *Adamson v. Comm'r*, 745 F.2d 541, 545 (9th Cir. 1984)). In assessing whether the INS agents' conduct amounts to an "egregious violation" of the petitioners' rights, "we must first determine whether the agents violated the Fourth Amendment. If they did, then we must determine whether the agents committed the violations deliberately or by conduct a reasonable officer should have known would violate the Constitution." *Id.* (footnote omitted).

### 1. Fourth Amendment

**[2]** "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573,

---

[6]Because the Fourth Amendment violation warrants suppression of the Forms I-213 and Gastelum' sworn statement, we do not reach petitioners' additional arguments in support of their motion to suppress.

586 (1980) (footnote omitted). The presumption of unconstitutionality that accompanies "the [warrantless] entry into a home to conduct a search or make an arrest" may be overcome only by showing "consent or exigent circumstances." *Steagald v. United States,* 451 U.S. 204, 211 (1981).

**[3]** The government does not dispute that the INS agents entered the residence of Gastelum and Lopez and, after briefly questioning Gastelum, arrested both in their home. It is also evident that, prior to entering the premises, the INS agents did not obtain a warrant to arrest either Gastelum or Lopez or, for that matter, to conduct a search of their residence.[7] The government makes no claim of exigent circumstances. Thus, in order to overcome the presumption of unconstitutionality attaching to the agents' entry, the government must show that the petitioners gave legally sufficient consent. *See, e.g., Steagald,* 451 U.S. at 211; *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *United States v. Matlock,* 415 U.S. 164, 169-71 (1974).

In relevant part, the IJ summarized her factual findings as follows:

> [Gastelum] evidently came to the door when they knocked and, upon establishing a verbal contact with her, [the agents] pushed the door open and entered and continued to talk to her. At no time did she tell them to leave or tell them she did not want to talk to them, although, apparently from what she recalls, they did not identify themselves until they were handcuffing her.

These findings reflect Gastelum's in-court testimony describing the circumstances of the agents' entry. The government, on the other hand, did not offer any testimony or consent

---

[7]The IJ's finding that the entry was made in the absence of a warrant is supported by substantial evidence. *See supra* note 2.

forms to show consent. Rather, it relied on the arresting officer's out-of-court assertion that "[c]onsent to enter was obtained from Fabiola GASTELUM-Lopez"—a statement contained in one of the Forms I-213 that petitioners seek to exclude. In the absence of any further evidence to support the government, we conclude that the IJ's factual findings adopting Gastelum's testimony are supported by substantial evidence. We therefore deem them conclusive. *See Melkonian*, 320 F.3d at 1065.

**[4]** We agree with the IJ's apparent conclusion that, with these factual findings, the government's entry did not satisfy the requirements of the Fourth Amendment. As we have made clear, "the government may not show consent to enter from the defendant's failure to object to the entry." *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990); *see also United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir. 1998) (suspect's moving aside to avoid physical contact with entering officers is insufficient to establish implied consent). We have sustained an *inference* of consent to enter a residence only under very limited circumstances—i.e., where the officers have verbally requested permission to enter and the occupant's action suggests assent, *see United States v. Garcia*, 997 F.2d 1273, 1281 (9th Cir. 1993) (holding that the officers' request to talk, combined with the suspect's affirmative response and step back clearing way for officers' entry, implied consent to enter), or where prior collaborative interactions between the suspect and the officers make the inference of consent unequivocal, *see United States v. Rosi*, 27 F.3d 409, 412 (9th Cir. 1994) (holding that a request by suspect who had been lawfully arrested outside the home to retrieve clothing from his home implied consent to officers' entry where the suspect gave a house key to the officers); *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir. 1985) (per curiam) (request that officers retrieve clothing from home amounts to consent). Here, there is no indication that the officers made any request to enter or that Gastelum collaborated with the INS officers in any way when they were at the door.

Accordingly, the bare fact that Gastelum neither refused to speak to them nor ordered them to leave after they pushed the door open and entered her home is insufficient to establish consent. As a consequence, the arrest of the petitioners in their home violated their Fourth Amendment rights. *See Payton*, 445 U.S. at 589-90.

The government contends that it had a right to detain Gastelum for questioning because it had a reasonable suspicion that she had used a false birth certificate. The government relies on our statement—originally made in *Benitez-Mendez v. INS*—that "INS investigators may not detain workers for citizenship status questioning unless the investigators are able to articulate objective facts providing them with a reasonable suspicion that each questioned person, so detained, is an alien illegally in this country." 760 F.2d 907, 909 (9th Cir. 1983).[8] This argument misses the point. The question is not whether the agents could have detained Gastelum for questioning had they encountered her outside of her residence. The issue is whether they could enter her home without a warrant or consent. In the absence of exigent circumstances, they could not. *See, e.g.*, *Payton*, 445 U.S. at 583; *Shaibu*, 920 F.2d at 1427-28; *see also Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 534 (1967) (holding that warrant is required before private home may be entered for administrative search in absence of consent or exigent circumstances). We therefore reject the government's contention.

### 2. Applicability of the Exclusionary Rule for "Egregious" Violations

[5] The statements sought to be suppressed were obtained from Gastelum and Lopez in the custody immediately following the unconstitutional entry of their residence. The govern-

---

[8]*But see Orhorhaghe*, 38 F.3d at 497 n.14 (noting, without deciding, that "[a] stricter standard [than reasonable suspicion] may apply where . . . the encounter takes place inside a residence . . . ." ).

ment has made no attempt to bear its burden of showing any change in circumstances or attenuation that would prevent the statements from qualifying as fruits of the Fourth Amendment violation. *See Brown v. Illinois*, 422 U.S. 590, 604-05 (1975). The statements would therefore be excludible in a criminal case. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963). In the present proceeding, however, we must next consider whether "the violations were sufficiently egregious to warrant the application of the exclusionary rule in these civil deportation proceedings." *Orhorhaghe*, 38 F.3d at 501. A Fourth Amendment violation is "egregious" if "evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a *reasonable officer should [have known]* is in violation of the Constitution." *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994) (quoting *Adamson*, 745 F.2d at 545) (emphasis and final alteration original). We conclude that reasonable officers should have known that they were violating the Fourth Amendment in entering Gastelum's and Lopez's home without a warrant, consent, or exigent circumstances.

**[6]** Few principles in criminal procedure are as well established as the maxim that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590. Accordingly, although the voluntary consent of a party who has authority over the premises renders the warrantless entry of a person's home by law enforcement personnel constitutionally valid, *see, e.g.*, *Matlock*, 415 U.S. at 169-71, exceptions to the warrant requirement are "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499 (1958). As we have already noted, in keeping with the narrow scope of the consent exception, we "ha[ve] never sanctioned entry to the home based on inferred consent" in the absence of a request by the officers or ongoing, affirmative cooperation by the suspect. *Shaibu*, 920 F.2d at 1426 (citing *United States v. Impink*, 728 F.2d 1228, 1233-34 (9th Cir. 1984)); *see also Albrektsen*, 151 F.3d

at 955; *cf. Garcia*, 997 F.2d at 1281; *Rosi*, 27 F.3d at 412; *Gilbert*, 774 F.2d at 964. Indeed, a full decade before the events giving rise to this litigation took place, we held that "in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent." *Shaibu*, 920 F.2d at 1428.

**[7]** Against this unequivocal doctrinal backdrop, reasonable officers would not have thought it lawful to push open the door to petitioners' home simply because Gastelum did not "tell them to leave or [that] she did not want to talk to them."**⁹** There is nothing ambiguous or arcane about our holding in *Shaibu*, which was handed down ten years prior to the INS agents' entry of petitioners' home. Nor has the government pointed to any authority in our Fourth Amendment jurisprudence suggesting that the warrant requirement applies with any less force in the administrative context. *See Camara*, 387 U.S. at 534 (requiring a warrant for civil administrative searches of residences). We conclude that reasonable INS agents should have known that they were violating the Fourth Amendment when they entered Gastelum's and Lopez's residence. Our confidence in this result is further underscored by our cognizance of "the extensive training INS agents receive in Fourth Amendment law." *Orhorhaghe*, 38 F.3d at 503 n.23 (citing *Lopez-Mendoza*, 468 U.S. at 1044-45). Thus, the INS agents' Fourth Amendment violation was "egregious" under this Circuit's controlling interpretation of the term. *See Adam-*

---

**⁹**We also note that valid consent to enter could not be inferred from the fact that the door was apparently "slightly open" when the INS agents showed up at the petitioners' doorstep. "Although an open door may . . . affect the range of permissible action for police possessing a warrant [in "knock notice" cases], there is no authority that an open door gives police legal grounds to enter the home without explicit request when they infer consent from mere acquiescence." *Shaibu*, 920 F.2d at 1427 (citing *Impink*, 728 F.2d at 1233 n.3).

*son*, 745 F.2d at 545. The fruits of the constitutional violation accordingly should have been suppressed.

## CONCLUSION

The IJ erred in denying the petitioners' motion to suppress the Forms I-213 and Gastelum's sworn statement. Because the government did not introduce any other evidence tending to show the petitioners' alienage, the petition for review is granted. We reverse the decision of the BIA and remand with instructions to dismiss the removal proceedings against the petitioners.

**PETITION FOR REVIEW GRANTED; REVERSED; REMANDED with instructions.**

---

BYBEE, Circuit Judge, concurring:

I concur fully in the majority opinion. I write separately to caution that our precedent has set us on a collision course with the Supreme Court.

In *INS v. Lopez-Mendoza*, Justice O'Connor, writing for a five-justice majority of the Supreme Court announced a straightforward rule: the exclusionary rule does not apply in civil deportation proceedings to suppress evidence obtained in violation of the Fourth Amendment. 468 U.S. 1032, 1046, 1050 (1984). After the final statement of this rule, Justice O'Connor's opinion continued, but the fifth vote did not. Writing only for a four-justice plurality, Justice O'Connor announced, in dicta, a possible exception to the rule:

> Finally, we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and

> undermine the probative value of the evidence obtained.

*Id.* at 1050-51 (Opinion of O'Connor, J.).

In a series of three subsequent cases, we took this dicta from the portion of the opinion that was not binding and adopted an exception of our own. *See Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994); *Gonzales-Rivera v. INS*, 22 F.3d 1441 (9th Cir. 1994); *Adamson v. Comm'r*, 745 F.2d 541 (9th Cir. 1984). The exception we adopted is, frankly, rather broad. In our circuit, the exclusionary rule must be applied in a deportation proceeding if the agents violated the Fourth Amendment and "the agents committed the violations deliberately or by conduct a reasonable officer should have known would violate the Constitution." *Orhorhaghe*, 38 F.3d at 493. If I am reading our decisions correctly, we have linked the exclusionary rule in civil cases to the qualified immunity standard: any constitutional violation for which an officer would lose immunity from suit is sufficient to trigger the exclusionary rule in a civil deportation proceeding. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). Regardless of how we arrived at this definition of "egregious," it is a definition of an exception that is almost certain, over time, to swallow up the rule.[1] Moreover, I suspect it is a definition which might even include the unseemly conduct of the INS agents in *Lopez-Mendoza*, which the Court held did *not* warrant applying the

---

[1]The First and Second Circuits appear to have adopted a more stringent definition of "egregious." A mere violation—even an obvious violation—is not grounds for excluding the evidence without some additional aggravating circumstance. *See Kandamar v. Gonzales*, 464 F.3d 65, 71 (1st Cir. 2006) (requiring "specific evidence of . . . government misconduct by threats, coercion, or physical abuse" to demonstrate egregiousness); *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 236 (2d Cir. 2006) ("*Lopez-Mendoza* requires more than a violation to justify exclusion. It demands "egregiousness." . . . Thus, the exclusion may well be proper where the seizure itself is gross or unreasonable *in addition to* being without a plausible legal ground . . . ." (emphasis added)).

exclusionary rule in that petitioner's immigration proceedings. *See Lopez-Mendoza*, 468 U.S. at 1036-37 (describing how INS agents created a chaotic mass exodus of workers from a processing plant and then positioned themselves at the plant exits to observe which fleeing workers could not speak English and which averted their eyes).

The Supreme Court determined that the high costs of the exclusionary rule rendered it too costly to apply in immigration proceedings. *See Lopez-Mendoza*, 468 U.S. at 1040-51. I need not recite that analysis here. Suffice it to say that the exclusionary rule improves the behavior of law enforcement even as it stymies the enforcement of the law, and Americans of all sensibilities continue to debate its merits. *See, e.g.*, Adam Liptak*, American Exception: U.S. Stands Alone in Rejecting All Evidence When Police Err*, N.Y. TIMES, July 19, 2008, Late Edition, at A1. Our case law appears destined to import the exclusionary rule, with all of its attendant costs, back into immigration proceedings, after the Court has taken it out. At some point, we may wish to revisit our position.