**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LUZ LOPEZ-RODRIGUEZ; FABIOLA
GASTELUM-LOPEZ,
                    *Petitioners,*

            v.

ERIC H. HOLDER, JR.,* Attorney
General,
                    *Respondent.*

No. 06-70868

Agency Nos.
A78-184-178
A78-184-179

ORDER

Filed March 27, 2009

Before: William C. Canby, Jr. and Jay S. Bybee, Circuit
Judges, and Justin L. Quackenbush,** Senior District Judge.

Order;
Dissent by Judge Bea

---

## ORDER

Judge Bybee has voted to grant the petition for rehearing en
banc. Judges Canby and Quackenbush have recommended
denial of en banc rehearing.

The petition for en banc rehearing has been circulated to
the full court. A judge requested a vote on whether to rehear
the matter en banc. The matter failed to receive a majority of

---

*Eric H. Holder, Jr. is substituted for his predecessor, Michael B.
Mukasey, as Attorney General of the United States, pursuant to Fed. R.
App. P. 43(c )(2).

**The Honorable Justin L. Quackenbush, Senior District Judge for the
Eastern District of Washington, sitting by designation.

the votes of the nonrecused active judges in favor of en banc consideration. Fed R. App. P. 35.

The petition for rehearing en banc is denied.

---

BEA, Circuit Judge, with whom O'SCANNLAIN, TALL-MAN, BYBEE, and CALLAHAN, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I respectfully dissent from the order denying rehearing en banc because the panel opinion directly contradicts the Supreme Court's decision in *INS v. Lopez-Mendoza* (*Mendoza*), 468 U.S. 1032 (1984), regarding when we should apply that singular jewel[1] of our legal procedure treasury: the exclusionary rule.

In *Mendoza*, the Supreme Court clearly held the exclusionary rule does not apply to bar illegally procured evidence from admission in a deportation hearing. *Mendoza*, 468 U.S. at 1050 (holding that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings").[2] The panel in *Lopez-Rodriguez v.*

---

[1] No other civilized or uncivilized country eschews probative evidence solely on the ground the police procured it in violation of the rules of evidence gathering. *See* Adam Liptak, *American Exception: U.S. Is Alone in Rejecting All Evidence if Police Err*, N.Y. Times, July 19, 2008, at A1.

[2] *Mendoza* concerns two consolidated cases. In the relevant appeal, uniformed immigration agents positioned themselves at the exits of a factory and "looked for passing employees who averted their heads, avoided eye contact, or tried to hide." 468 U.S. at 1036-37. Agents arrested an alien they described as "very evasive"; the alien admitted unlawful entry when subsequently questioned. *Id.* at 1037. At his deportation hearing, the alien contended his admission should be suppressed as "the fruit of an unlawful arrest." *Id.* The Immigration Judge and the Board of Immigration Appeals both declined to apply the exclusionary rule and ordered the alien removed. *Id.* at 1038. This court reversed and applied the exclusionary

*Mukasey* (*Rodriguez*), 536 F.3d 1012 (9th Cir. 2008), held precisely the opposite. How we got there is an interesting—and perhaps cautionary—tale. We seem to have turned Supreme Court plurality dicta into majority dicta simply by saying so. Then, we have applied that dicta, in a manner not consistent with the sole case cited in the dicta, to create a new rule—one never envisioned by either the Supreme Court majority or the plurality.

Let's pick our way through how we got there.

**Step one.** Identify the dicta to be used: "Finally, we do not deal here with egregious violations of the Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained. *Cf. Rochin v. California*, 342 U.S. 165 . . . (1952)." *Mendoza*, 468 U.S. at 1050-51 (plurality opinion of O'Connor, Blackmun, Powell, and Rehnquist, JJ.).

**Step two.** Mischaracterize the *Mendoza* dicta by calling it part of the "majority" opinion. *Adamson v. Comm'r*, 745 F.2d 541, 545-46 (9th Cir. 1984).[3] Then, massage the dicta's "test"

---

rule because the alien's "detention by immigration officers violated the Fourth Amendment, [and] the statements he made were a product of that detention." *Id.* The Supreme Court reversed us. *Id.* at 1050.

The Court has never overruled *Mendoza*. Indeed, it has not extended the exclusionary rule to other federal civil proceedings. *See Penn. Bd. of Probation & Parole v. Scott*, 524 U.S. 537, 363-64 (1998) (refusing to extend the exclusionary rule to parole revocation proceedings and noting that the Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials," including grand jury proceedings, *see United States v. Calandra*, 414 U.S. 338, 343-46 (1974); civil tax proceedings, *see United States v. Janis*, 428 U.S. 433, 448, 454 (1976); and civil deportation proceedings, *see Mendoza*, 468 U.S. at 1050).

[3]In *Adamson*, Seattle police officers investigating a bank robbery acted on a tip from a hotel maid and searched a hotel room without a warrant. 745 F.2d at 543. Based on the money and drugs they found, the officers

into a new dicta by asking not whether the *conduct* of the officers "transgress[ed] notions of fundamental fairness[4] and undermine[d] the probative value of the evidence obtained," but whether the officers acted with *knowledge*—actual or constructive—that their actions, even if mannerly, would violate the Constitution. *See id.*

   **Step three.** Clothe the *Mendoza* dicta with a new definition —"all bad faith violations of an individual's fourth amendment rights are considered sufficiently egregious to require application of the exclusionary sanction in a civil proceeding"[5] —and then eliminate the possibly additional requirement of the *Mendoza* dicta that the means of procuring the excludable evidence need undermine the probative value of the evidence obtained in order to apply the exclusionary rule. *Gonzalez-*

---

obtained a search warrant, seized the evidence, and arrested Adamson. *Id.* at 543-44. Adamson was not prosecuted for any crime. *Id.* at 544. The Commissioner of the Internal Revenue Service ("Commissioner"), however, used the evidence to determine that Adamson failed to pay income taxes. *Id.* The Tax Court upheld the Commissioner's assessment, concluding that "the evidence was illegally seized by the Seattle police and would have been excluded in a criminal proceeding[, but] . . . the evidence was admissible in a civil tax proceeding." *Id.*

   This court affirmed. *Id.* at 548. Citing the *Mendoza* dicta, this court issued a new rule in dicta: "When evidence is obtained by deliberate violation of the fourth amendment, or by conduct a reasonable officer should know is in violation of the Constitution, the probative value of that evidence cannot outweigh the need for a judicial sanction." *Id.* at 545. The exclusionary rule did not apply in this case, however, because "the constitutional questions are close enough that a reasonably competent police officer could have believed the search was legal." *Id.* at 546.

   [4]This massaging occurred notwithstanding that the *Mendoza* dicta was clearly referring to the INS officers' *conduct* in making arrests, not their *knowledge* they were violating the Fourth Amendment by arresting the petitioner without a warrant. "At issue here is the exclusion of credible evidence gathered in connection with *peaceful arrests* by INS officers." 468 U.S. at 1051 (emphasis added).

   [5]Precisely the view of Justice Brennan, dissenting in *Mendoza*. 468 U.S. at 1051-52.

*Rivera v. INS*, 22 F.3d 1441, 1449, 1451 (9th Cir. 1994) (citation, internal quotation marks, and alterations omitted) ("[U]nder both *Lopez-Mendoza* and controlling Ninth Circuit law, a fundamentally unfair Fourth Amendment violation is considered egregious regardless of the probative value of the evidence obtained.").[6]

**Step Four.** We arrive at *Rodriguez*: if it was clear enough the officers *knew* or *should have known* they were violating the Fourth Amendment, *see Adamson*, 745 F.2d at 545-46, we label their conduct "egregious" based solely on that *knowledge*, *see Gonzalez-Rivera*, 22 F.3d at 1449, no matter how "peaceful" were their actual actions in collecting the evidence, and—perhaps importantly—say *nothing* more about whether their actions cast doubt on the probative value of the evidence obtained.

Now you have it: *Rodriguez* announces a rule directly contrary to the Supreme Court's holding in *Mendoza*, and in conflict with the First and Second Circuits to boot. *See* Fed. R. App. P. 35.

We ought to have corrected the result of our taking a wrong turn in *Adamson* and *Gonzalez-Rivera* by considering *Rodriguez* en banc, rather than importing another and inapposite notion into our exclusionary rule jurisprudence from *Saucier*

---

[6]In *Gonzales-Rivera*, border patrol officers stopped Gonzalez-Rivera based solely on his Hispanic appearance. 22 F.3d at 1442. When Gonzalez-Rivera failed to produce documents permitting him legal residence in the United States, the officers arrested and questioned him. *Id.* at 1443. The officers filled out an I-213 Form based on the information obtained from the stop. *Id.* The government initiated removal proceedings against Gonzalez-Rivera. *Id.* The IJ suppressed the I-213 Form, concluding that stopping Gonzalez-Rivera based solely on his race constituted an "egregious Fourth Amendment violation." *Id.* at 1444. The BIA reversed. *Id.* This court reversed the BIA and granted Gonzalez-Rivera's petition for review because "the officers' conduct in this case constituted a bad faith, egregious constitutional violation that warrants application of the exclusionary rule." *Id.* at 1452.

*v. Katz*, 533 U.S. 194 (2001).[7] As Dietrich Bonhoeffer[8] said, "If you board the wrong train, it is no use running along the corridor in the other direction."

## I.

In *Rodriguez*, immigration agents received a tip that Fabiola Gastelum-Lopez ("Lopez"), a native and citizen of Mexico, had used a U.S. citizen's birth certificate fraudulently to obtain employment. *Id.* at 1013. The agents, without a warrant, went to the home where Lopez lived with her aunt, Luz Lopez-Rodriguez ("Rodriguez"), also a native and citizen of Mexico. *Id.* at 1014. After Rodriguez opened the door slightly, the agents "pushed the door and entered" the home without the consent of either Rodriguez or Lopez.[9] *Id.* The

---

[7]In *Saucier*, two police officers arrested a protester who appeared at a speech given by Vice President Al Gore at the Presidio Army Base in San Francisco. 533 U.S. at 197-98. The protester brought an action in district court, alleging, *inter alia*, the officers used excessive force to arrest him. *Id.* at 199. The district court denied the officers' motion for summary judgment, holding there were fact issues as to whether the officers were entitled to qualified immunity on the excessive force claim. *Id.* This court affirmed. *Id.* at 200. The Supreme Court reversed. *Id.* at 209. In so holding, the Supreme Court established that the inquiry for whether a government official is entitled to qualified immunity "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

[8]"Dietrich Bonhoeffer (February 4, 1906-April 9, 1945) was a German Lutheran pastor, theologian, participant in the German Resistance movement against Nazism, and a founding member of the Confessing Church. He was involved in plots planned by members of the Abwehr (the German Military Intelligence Office) to assassinate Adolf Hitler. Bonhoeffer was arrested in March 1943, imprisoned, and eventually executed by hanging shortly before the war's end." Dietrich Bonhoeffer, Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/Dietrich_Bonhoeffer (last visited Jan. 21, 2009).

[9]The facts relating to the agents' entry reflect Lopez's testimony before the immigration judge ("IJ"). *See Rodriguez*, 536 F.3d at 1014. The agents did not testify at the removal hearing, so the IJ "credited Lopez's version of the events." *Id.* at 1015.

agents neither broke the door down nor pushed it open so forcefully as to injure either woman in any way. *See id.*

The agents questioned Lopez, who gave inconsistent answers about her name and place of birth. *Id.* The agents then arrested both Lopez and Rodriguez. *Id.* The agents further questioned Lopez and Rodriguez while in custody, and both women admitted their immigration status and country of origin. *Id.* Neither woman suggested on appeal that the questioning included any physical or mental coercion. *See id.*

For each woman, the agents prepared I-213 Forms, Record of Deportable/Inadmissible Aliens, that established that both Lopez and Rodriguez "are natives and citizens of Mexico not authorized to be in the United States." *Id.* The agents also produced a Record of Sworn Statement for Lopez in which she "admitted that she had received a [false] birth certificate" from her supervisor at work. *Id.*

The government then initiated removal proceedings against both petitioners. *Id.* Before an immigration judge ("IJ"), the petitioners moved to suppress the I-213 Forms and the Record of Sworn Statement as the fruits of an "egregious" violation of the Fourth Amendment. *Id.* The IJ denied the petitioners' joint motion because the agents' violations of the petitioners' Fourth Amendment rights were not "so egregious" as to warrant application of the exclusionary rule. *Id.* at 1015. The IJ ordered both petitioners removed. *Id.* On appeal, the Board of Immigration Appeals ("BIA") affirmed the IJ's decision. *Id.*

The panel reversed and granted the petition for review. *Id.* The panel held that the information in the I-213 Forms and the Record of Sworn Statement "was obtained in violation of [the petitioners'] Fourth Amendment rights and that the violation was 'egregious.' " *Id.* The panel based its holding on its conclusion that "reasonable INS agents *should have known* that they were violating the Fourth Amendment when they entered [the petitioners'] residence." *Id.* at 1019 (emphasis

added). In other words, the panel imported the unrelated test for refusing qualified immunity, established by the Supreme Court in *Saucier v. Katz*, 533 U.S. at 202, to determine not whether the immigration officers were entitled to qualified immunity, but whether the exclusionary rule should be used in this civil context. *See id.; see also Adamson*, 745 F.2d at 545-46.

## II.

The panel's holding in this case is in direct conflict with that of the Supreme Court in *Mendoza*. In *Mendoza*, the majority held that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings." 468 U.S. at 1050. Nonetheless, the panel here did just the opposite—applied the exclusionary rule in civil removal hearings.

The exclusion of evidence "has always been our last resort, not our first impulse." *Herring v. United States*, 129 S. Ct. 695, 700 (2009) (citation and quotation marks omitted).[10] The exclusionary rule "applies only where it results in appreciable deterrence" that outweighs "its substantial social costs." *Id.* at

---

[10]In *Herring*, a police officer called a county warrant clerk to see whether there were any outstanding arrest warrants for a suspect. 129 S. Ct. at 698. The clerk checked a computer database and told the officer that there was a warrant for the suspect's arrest. *Id.* The officer then arrested the suspect and discovered methamphetamine and a pistol in the suspect's possession during a search incident to arrest. *Id.* However, when the clerk went to retrieve the actual warrant from the files in order to fax a copy to the officer, she discovered it had been recalled five months earlier. *Id.* The database had not been updated to reflect the recall. *Id.* By the time the clerk called the officer to notify him of the mistake, the suspect had been arrested and searched. *Id.*

At his trial for illegal drug and gun possession, the suspect moved to suppress the evidence. *Id.* at 699. The district court denied the motion because "the arresting officers had acted in . . . good-faith," and the Eleventh Circuit affirmed. *Id.* The Supreme Court affirmed the Eleventh Circuit. *id.*

700-01 (citations, internal quotation marks, and alterations omitted). In *Mendoza*, the Supreme Court reached its conclusion that the exclusionary rule is inapplicable in civil immigration proceedings after a careful weighing of the rule's costs and benefits in this context.

The Court identified one benefit of utilizing the exclusionary rule in immigration hearings: deterrence of immigration agents' unconstitutional conduct. *Id.* at 1041. However, the Court noted several factors that undermine the deterrent value of the exclusionary rule in immigration cases. *Id.* at 1043-45. For example, because 97.5% of aliens agree to voluntary departure without a hearing, "it is highly unlikely that any particular arrestee will end up challenging the unlawfulness of his arrest in a formal deportation proceeding"; therefore, "the arresting officer is most unlikely to shape his conduct in anticipation of the exclusion of evidence at a formal deportation hearing." *Id.* at 1044. Similarly, the INS already has a "comprehensive scheme for deterring Fourth Amendment violations," including education about Fourth Amendment law, regulations requiring the exclusion of evidence "seized through intentionally unlawful conduct" from proceedings, and "a procedure for investigating and punishing . . . violations." *Id.* at 1044-45.

Moreover, the Court concluded that "the social costs of applying the exclusionary rule in deportation proceedings are both unusual and significant." *Id.* at 1046. Most notably, an alien's illegal presence in this country is an ongoing violation of the law, and the effective application of the exclusionary rule could lead to an alien's continued unregistered presence in the United States. *Id.* at 1046-47. To extend the exclusionary rule in this way goes too far, the Court concluded:

> The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of the ongoing crime. When the crime in question involves

unlawful presence in this country, the criminal may go free, but he should not go free within our borders.

*Id.* at 1047. Finally, the introduction of complex Fourth Amendment issues to the "deliberately simple deportation hearing system" would divert limited immigration resources from their main goal of processing "very large numbers" of removal actions. *Id.* at 1048. Therefore, the Court concluded that the costs of the exclusionary rule outweigh its benefits in the civil immigration context.[11] *Id.* at 1050. Nonetheless, the panel in *Rodriguez* applied the exclusionary rule to civil removal proceedings.

## III.

As one might suspect of an intermediate court, we have never frontally challenged the Supreme Court's determination that the balancing of costs and benefits rules out the use of the exclusionary rule in immigration cases. Instead, this court has relied on dicta asserted in a part of the *Mendoza* opinion signed by a mere plurality of the Court. Four justices noted that "we do not deal here with egregious violations of the Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained. *Cf. Rochin v. California*, 342 U.S. 165 . . . (1952)." *Id.* at 1050-51.

---

[11]Another cost the Court did not consider: the possibility that application of the exclusionary rule *increases* crime. *See generally* Raymond A. Atkins & Paul H. Rubin, *Effects of Criminal Procedure on Crime Rates: Mapping Out the Consequences of the Exclusionary Rule*, 46 J. Law & Econ. 157 (2003) (finding empirical support for the idea that application of the exclusionary rule will lead criminals to commit more crime, because the probability of conviction or detection is reduced when police "substitut[e] away from those activities that require a warrant toward those that do not"). By the same logic, the extension of the exclusionary rule to civil immigration proceedings could lead to an increase in illegal border crossings.

Our cases have relied on—but, alas, have misapplied—this dicta to provide support for the application of the exclusionary rule in certain immigration cases. *See Gonzalez-Rivera*, 22 F.3d at 1449. The *Rodriguez* panel, following circuit precedent, held that a "Fourth Amendment violation is 'egregious' if 'evidence is obtained by deliberate violations of the Fourth Amendment, or by conduct a reasonable officer should have known is in violation of the Constitution." 536 F.3d at 1081 (citations, brackets, and emphasis omitted). This standard equates the *Mendoza* dicta with the qualified immunity standard of *Saucier v. Katz.*

Let's say the immigration officers had no warrant. Let's say they also had no probable cause to believe a crime was being committed or was about to be committed. Further, there were no exigent circumstances suggesting the petitioners might escape. Finally, let's say the officers had just read *Saucier v. Katz* thoroughly and correctly, and they knew they had no right to enter the petitioners' home. If the immigration officers knew—no doubt about it and flat out—that they had no right to enter the petitioners' house, the officers would then be deprived of qualified immunity in a § 1983 action based on their violation of the Fourth Amendment. But note: in this hypothetical, I have not described the *conduct* of the officers. Hence, we cannot judge—and the panel in *Rodriguez* could not judge—whether their *conduct* was "egregious."

The *Mendoza* plurality cited a single case as an example of an egregious violation of the Fourth Amendment: *Rochin v. California*, 342 U.S. 165 (1952). *Rochin*, notably, does not deal with whether the officers *knew* or *should have known* they were violating Rochin's rights. It instead deals specifically with the *conduct* of law enforcement officers, who forcibly arrested Rochin and obtained drug possession evidence without Rochin's consent by forcing a tube down his throat to pump his stomach; Rochin had been observed swallowing something very quickly, just seconds after seeing the officers who would arrest him. *Id.* at 166.

> This is *conduct* that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and screw to permit of constitutional differentiation.

*Id.* at 172 (emphasis added). Not only was the *conduct* of the officers in *Rodriguez*—who violated the Fourth Amendment when they pushed their way into the petitioners' residence without consent—in no way on a par with that of the officers in *Rochin*, but the *Rodriguez* panel did not even examine the officers' *conduct*. Instead, the panel imported the unrelated *Saucier v. Katz* qualified immunity standard and asked whether the officers *knew* they were violating the petitioners' Fourth Amendment rights. The officers' knowledge does not fall within the definition of "egregious" conduct asserted by the *Mendoza* dicta, as illustrated by the plurality's citation: "*Cf. Rochin v California*, 342 U.S. 165 . . . (1952)."[12] *Mendoza*, 468 U.S. at 1051.

Finally, the *Mendoza* dicta seems to posit a conjunctive test.[13]

---

[12]"Literally, '*cf.*' means 'compare.' " The Bluebook: A Uniform System of Citation 47 (Columbia Law Review Ass'n et al. eds., 18th ed. 2005). The use of "*cf.*" signals that the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." *Id.*

[13]Textually, the test of the *Mendoza* dicta is phrased in the conjunctive, but the better reading, which I propose had best be left to the Court, which authored the phrase, may be to treat the test as disjunctive because the *Mendoza* plurality cited to *Rochin v. California*, 342 U.S. 165 (1952), as its only example of egregiousness. While the conduct of the officers in *Rochin*—pumping a suspect's stomach without consent—transgressed notions of fundamental fairness, the results of this egregious conduct produced evidence of undoubted probative value: the unlawful drugs in Rochin's possession that Rochin had swallowed when confronted by police. *Id.* at 206.

To trigger application of the exclusionary rule, the "egregious" conduct must *both* (1) "transgress notions of fundamental fairness" *and* (2) "undermine the probative value of the evidence obtained." 468 U.S. at 1050-51. Even were entering the petitioners' residence without consent to transgress notions of fundamental fairness in law enforcement dealings, the petitioners have never claimed that the statements in the I-213 Forms and Record of Sworn Statement were rendered unreliable because of the methods of questioning and documentation used by the officers—their *conduct*. The petitioners did not claim that the immigration officers coerced their confessions or that the officers' actions in some other way undermined the probative value of the information contained in the statements.

Therefore, even if the *Mendoza* dicta implies support for the sometimes application of the exclusionary rule in civil immigration proceedings, the panel misapplied such implication in two ways: (1) by reading "egregious" as describing the officers' *knowledge* rather than their *conduct* and (2) perhaps by failing to assess the probative value of the evidence so produced in a conjunctive test.

## IV.

The Ninth Circuit is not alone in reading the *Mendoza* dicta as permitting the application of the exclusionary rule in cases of egregious Fourth Amendment violations. The First and Second Circuits have done so as well. However, those circuits have interpreted "egregious" correctly, as limited by the *Mendoza* plurality's citation to *Rochin v. California*; that is, they have interpreted "egregious" as describing the *conduct* of investigating officers toward the petitioner alien.

In *Kandamar v. Gonzales*, 464 F.3d 65, 71-72 (1st Cir. 2006), the First Circuit defined "egregious government conduct" as "government misconduct by threats, coercion or physical abuse." Kandamar, a native and citizen of Morocco,

entered the United States legally but overstayed his visa. *Id.* at 67. In response to a Department of Homeland Security ("DHS") National Security Entry-Exit Registration System notice, Kandamar reported to a Boston federal building to register as a nonimmigrant alien. *Id.* at 67-68. Kandamar presented his expired Moroccan passport, which DHS officers took. *Id.* DHS officers then arrested Kandamar and placed him in removal proceedings because he had overstayed his visa. *Id.* at 67.

Kandamar moved to suppress the evidence gathered by DHS and alleged the registration requirement constituted an egregious violation of his constitutional rights in that it "constitute[d] racial profiling and discrimination based on national origin; violate[d] substantive due process because its use 'to entrap nationals of certain countries' [wa]s fundamentally unfair; and violate[d] equal protection by treating legal and illegal entrants differently." *Id.* at 68. An IJ denied Kandamar's motion to suppress and ordered him removed. *Id.* The BIA dismissed Kandamar's appeal. *Id.* at 69. The First Circuit denied Kandamar's petition for review and affirmed the denial of Kandamar's motion to suppress because "Kandamar did not proffer any specific evidence of any government misconduct by threats, coercion or physical abuse . . . that would constitute egregious government conduct." *Id.* at 71. Therefore, the First Circuit's interpretation of "egregious" in the *Mendoza* dicta refers to the officers' *conduct*.

The Second Circuit reaches a similar conclusion. In *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 236 (2d Cir. 2006) (emphasis added), the Second Circuit defined "egregiousness" as based on "the characteristics and severity of the offending *conduct*." A border patrol agent approached Almeida-Amaral, a native and citizen of Brazil, in a gas station parking lot and requested identification. *Id.* at 232. The agent arrested Almeida-Amaral when he presented his Brazilian passport. *Id.* Almeida-Amaral then told the agent he was a Brazilian citizen illegally in the United States; these state-

ments formed the basis of an I-213 Form prepared by the agent. *Id.* at 233.

Almeida-Amaral moved to suppress the I-213 Form as the fruit of an illegal seizure; he contended that "because the uniformed agent was wearing a firearm and because he commanded [Almeida-Amaral] to 'Stop,' [Almeida-Amaral] was seized without any cause whatsoever in clear violation of his constitutional rights." *Id.* An IJ denied Almeida-Amaral's motion to suppress. *Id.* The IJ ordered Almeida-Amaral removed, and the BIA affirmed. *Id.* The Second Circuit denied Almeida-Amaral's petition for review. *Id.* at 238. The court reasoned that, while the agent had no valid reason for stopping Almeida-Amaral, "more is needed"—a seizure is "egregious" if it is "gross or unreasonable" or "sufficiently severe." *Id.* at 235-36.

Thus, both the First and Second Circuits evaluate "egregiousness" in terms of the *conduct* of law enforcement officers toward the petitioner, while our *Rodriguez* panel looked to the officers' *knowledge* of the Fourth Amendment's strictures. *Rodriguez* was worthy of en banc reconsideration not only because it flatly conflicts with a Supreme Court holding (*Mendoza*), but also because it constitutes a split with two of our sister circuits. Fed. R. App. P. 35.[14]

## V.

Judge Bybee's fine concurrence puts it well: "our precedent has set us on a collision course with the Supreme Court. . . . [by] import[ing] the exclusionary rule, with all of its attendant costs, back into immigration proceedings, after the Court has taken it out." *Rodriguez*, 536 F.3d at 1019-20 (Bybee, J., concurring). Because this case directly conflicts with Supreme Court precedent as well as the positions of two of our sister

---

[14]I have been unable to find any other circuit court that agrees with our *Rodriguez* reasoning or holding.

circuits, I must respectfully dissent from the order denying rehearing en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.